SCARSDALE NATIONAL BANK AND TRUST COMPANY, Plaintiff,

v.

The TORONTO–DOMINION BANK, Defendant.

The TORONTO–DOMINION BANK, Defendant and Interpleading Plaintiff,

v.

GRAPHIC CENTRE (ONTARIO) INC., Interpleaded Defendant.

GRAPHIC CENTRE (ONTARIO) INC., Interpleaded Defendant and Third-Party Plaintiff,

v.

Martin C. LICHT, Esq., and Murray M. Loecher, Esq., individually and as partners formerly doing business under the name of Loecher & Licht; Martin C. Licht, Esq., Robert S. Feigen, Esq., Howard A. Drucker, Esq., and Murray M. Loecher, Esq., individually and as partners doing business under the name of Feigen, Drucker, Loecher & Licht; Web Equipment Sales Inc., and Michael B. Goldman, Third-Party Defendants.

No. 80 Civ. 2894.

United States District Court, S. D. New York.

Feb. 24, 1982.

Winthrop, Stimson, Putnam & Roberts, New York City, for plaintiff, Scarsdale Bank and Trust Co.; John F. Pritchard, Robin L. Spear, New York City, of counsel.

White & Case, New York City, for interpleaded defendant and third-party plaintiff, Graphic Centre, Inc.; Paul Bschorr, Margaret Murphy, New York City, of counsel.

Rogers, Hoge & Hills, New York City, for third-party defendants, Martin C. Licht, Esq., et al.; W. Hurbert Plummer, William J. Foster, New York City, of counsel.

Avstreih, Martino & Weiss, Mount Vernon, N. Y., for third-party defendant, Michael B. Goldman; Leonard A. Weiss, Mount Vernon, of counsel.

OPINION

CONNER, District Judge:

This action to recover payments under a letter of credit, which was tried by the

Court without a jury,[1] is the result of a business deal gone awry. Jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332. This Opinion incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

*Procedural Background*

Scarsdale National Bank and Trust Company ("Scarsdale") commenced this action against the Toronto-Dominion Bank ("Toronto-Dominion")[2] for payment of two drafts totalling $165,000. The drafts were submitted for payment under a letter of credit issued by Toronto-Dominion at the request of Graphic Centre, Inc. ("Graphic Centre") for the benefit of Web Equipment Sales, Inc. ("Web"). Toronto-Dominion interpleaded Graphic Centre, which filed a third-party complaint against Michael B. Goldman ("Goldman"), president of Web, and Martin C. Licht ("Licht"), Goldman's attorney.[3] Licht in turn has asserted cross-claims against Goldman.

Pursuant to a stipulation among Scarsdale, Toronto-Dominion and Graphic, Toronto-Dominion has paid the $165,000 into the Court's registry and has been discharged from any further liability under the letter of credit.

*Factual Background*

Web, a corporation with its principal place of business in Scarsdale, New York, was at all relevant times engaged in the business of buying, refurbishing and selling used web-fed printing presses. In June of 1979, Web entered into a contract with Graphic Centre, a printer having its princi-

pal place of business in Toronto, Canada. The contract called for Web's delivery to and assembly in Graphic Centre's Toronto printing plant of an eight-unit web-fed printing press. Because of disputes between Web and Graphic Centre over performance and payments, the contract was amended by two Telex messages, both dated January 18, 1980, to provide, in part, that:

"In consideration of Web's undertaking Graphics shall provide an irrevocable letter of credit from a Canadian chartered bank to Web for $265,000 which letter of credit shall provide that Graphics shall pay to Web the $265,000 in the following manner and upon the happening of the following events.

"(A) When free title to the eight unit press is in the name of Graphics.

"(B) 100,000 dollars US when the cylinders and rubbers for the rebuilding of the eight unit press and attachment arrive in Toronto.

"(C) 65,000 dollars US when the eight unit press actually starts functioning.

"(D) 100,000 dollars US when the eight unit press produces the first document which is substantially in compliance with the sample or is equal in standard to the sample provided by Web at the commencement of the contract."

Ex. 21.[4]

Graphic Centre applied to Toronto-Dominion for the letter of credit. To effectuate the terms stated in the January con-

---

1. The trial was held on September 28 and October 1, 1981.

2. Toronto-Dominion, defendant and interpleading plaintiff, is a banking corporation chartered under the laws of Canada, with its principal place of business in Toronto, Province of Ontario. Toronto-Dominion is licensed to do business and does business in the State of New York and maintains an Agency in New York, New York.

3. Licht's various law partners were also sued by Graphic Centre. Licht and Murray M. Loecher, Esq., third-party defendants, were at relevant times prior to March 1, 1980 law partners practicing law under the name Loecher & Licht in New York, New York. Robert S. Feig-

en, Esq., Howard A. Drucker, Esq., Murray M. Loecher, Esq. and Licht, third-party defendants, were at relevant times since at least March 1, 1980 law partners practicing law under the name of Feigen, Drucker, Loecher & Licht in New York, New York. Either Loecher & Licht or Feigen, Drucker, Loecher & Licht, both being third-party defendants, represented Web at all relevant times. Licht was the attorney from such firms responsible for such representation.

4. References to documents are in the form "Ex. ____." These documents were placed into evidence pursuant to the Stipulation and Order Relating to Documentary Evidence.

tract amendment, the letter of credit required that each of the three drafts presented thereunder [5] be accompanied by a certificate signed by Graphic Centre stating that the corresponding stage of performance under the amended contract had been completed.[6] The letter of credit, which had an April 1 expiration date, was issued by Toronto-Dominion on February 1, 1980, at which time Graphics transferred $265,000 to Toronto-Dominion in payment therefor.

In late 1979 and early 1980, Web engaged in negotiations with its bank, Scarsdale,[7] for additional financing. Web had established a banking relationship with Scarsdale in 1973 and from 1973 to 1979 Scarsdale had made a number of loans to Web to finance its used printing press business. Web had paid off a number of these loans but as of October 1979 owed Scarsdale an outstanding balance of $319,812. In October 1979, Web requested that Scarsdale grant it an additional $250,000 term loan and a renewal of its $250,000 line of credit. Rush Wilson III ("Wilson"), then senior vice president of Scarsdale in charge of the Web account and a close friend of Goldman's, recommended that the request be honored. However, at meetings of its loan committee on October 17 and 31, 1979, Scarsdale decided to deny this request. Furthermore, the loan committee determined that future loan requests would be reviewed on an "offering basis," which meant that all loan requests would have to be approved by Richard Gerloff ("Gerloff"), Scarsdale's president. The bank also took the position that any future loans to Web would have to be fully secured by negotiable hard assets. Wilson informed Goldman of these decisions in November 1979.

In late December 1979 or early January 1980, Goldman told Wilson that Web needed additional funds to complete its contract with Graphic Centre and inquired whether a letter of credit provided by Graphic Centre for the benefit of Web would be acceptable collateral. Wilson stated that a letter of credit would suffice only if it was irrevocable and unconditional. Wilson testified that by "unconditional" he meant a "clean" letter of credit, and that by a "clean" letter of credit he meant two things: (1) a letter of credit that did not require the performance of any conditions other than the passage of time to render it negotiable, and (2) a letter of credit that did not require the presentation of any documents other than the drafts drawn under it.

Later that month, Goldman informed Wilson that the Web-Graphic Centre contract had been amended to provide for a letter of credit and gave Wilson a copy of the January 18, 1980 Telex message detailing the substance of the proposed letter. In a file memorandum dated January 25, 1980, Wilson noted that the letter of credit was to be a performance letter of credit which would require Web to install and refurbish the press in compliance with the contract terms and that the performance would not be completed until about April 10. In this memorandum, Wilson also noted his recommendation that Scarsdale grant Web a new $250,000 loan, which would be collateralized by the assignment of the proceeds under the letter of credit.

A few days later, Goldman signed a number of documents required for the new loan, including an assignment of the proceeds of the letter of credit. In most of the previous situations in which Scarsdale took a letter of credit in connection with a loan to Web, Scarsdale had obtained an assignment of the letter of credit or the proceeds and had obtained an acknowledgment of the assignment from the issuing bank.

In this case, Wilson testified that he did not recall whether he had asked Goldman to sign the assignment nor could he identify

**5.** The three drafts were to be presented for payment in the amounts of $100,000, $65,000 and $100,000, respectively.

**6.** The letter of credit also provided that "We [Toronto-Dominion] hereby engage with ... bona fide holders that drafts drawn and negotiated in conformity with the terms of this credit will be duly honored upon presentation."

**7.** Scarsdale is a national banking corporation with its principal place of business in New York state.

the document. Wilson did identify his signature on the assignment form, however. Wilson also testified that he did not believe that he had ever had a conversation with anyone at Toronto-Dominion regarding the assignment of the letter of credit. Peter Becher ("Becher"), manager of the Eaton Centre branch of Toronto-Dominion where Graphic Centre maintained its account, testified to the contrary. Becher testified that Wilson informed him that Scarsdale had an assignment of the letter of credit and asked whether Becher would acknowledge and honor this assignment. This conversation occurred before Toronto-Dominion issued the letter of credit in its final form, which required the presentation of the certificates. Becher testified:

"Well, I mentioned to him that not having seen the document, first of all, I could not comment on it. I did not know whether we could accept the assignment, and my understanding was since it was a non-transferable letter of credit I did not believe that it was assignable, and I took this document to be an assignment."

Trial Transcript, p. 124. The Court credits Becher's testimony as to the occurrence and substance of the conversation.

A few days after the conversation (sometime at the end of January or early February), Goldman delivered the assignment of proceeds form to Becher's office. Toronto-Dominion did not sign the form and Wilson did not inform Gerloff of the episode. At trial, Wilson testified as to the reasons he did not pursue the assignment of proceeds.

"Q. Mr. Wilson, do you recall giving Mr. Goldman an assignment of proceeds form in connection with this letter of credit transaction?

"A. Yes.

"Q. Do you recall when you gave him that form?

"A. Not specifically, but I believe it was during one of the several discussions that we had in anticipation that a letter of credit might be forthcoming.

"Q. Once the letter of credit had been issued in the form to which you have testified, was the assignment of proceeds form any longer of any relevance to Scarsdale?

"A. It appeared to be of no further relevance.

"Q. Did Mr. Goldman or any other representative of Web tell you that he had delivered the assignment of proceeds form to Toronto-Dominion or to Graphic Centre?

"A. I don't recall.

"Q. Did you ever hear from Graphic Centre or Toronto-Dominion that they were not prepared to enter into an assignment of proceeds in connection with this letter of credit?

"A. No, I don't believe there was any such.

\* \* \* \* \* \*

"Q. Would you explain to the Court whether an assignment of proceeds has any place in a letter of credit transaction where the certificates and the documents have been received by the bank?

"A. Yes, they may very well have an interest in the proceeds and the applicant is, thereby, assigning those proceeds, which assignment must be acknowledged by both parties.

"Q. You are now testifying concerning a letter of credit transaction of the kind you originally envisaged where an unconditional letter of credit would be issued and there would be an assignment of the proceeds of the unconditional letter of credit? My question was, was it necessary in connection with the manner in which the transaction was actually carried out for there to be an assignment of proceeds to Scarsdale?

"A. No, I believe there was no need."

Trial Transcript, pp. 55–56.

This testimony is not entirely consistent with the deposition testimony of Gerloff, Scarsdale's president, as to how he would have treated such information. He testified:

"Q. We're assuming a set of circumstances and the set of circumstances we're assuming is that this was prepared, it was presented to the Toronto-Dominion Bank and Toronto-Dominion Bank told you before you had made the loan that this was acceptable to them, so long as it was acceptable to Graphic Centre, and Rush Wilson came to you with a question of what should we do or came to you with a recommendation as to what you do to see if you agreed with him.

"A. Well, if we were in a situation where we hadn't extended the loan and we were faced with a rejection that was as you've described, if we deemed that rejection to be a valid one, which impaired our ability to negotiate the item at some time in the future, then we would have taken the position we took back in January, when we were first presented with the letter, which was that it wasn't acceptable.

"Q. By saying that this would have caused you concern in any event, aren't you saying that this would have given you cause to pursue that course of action?

"A. I'm saying that it might have. I really can't give you an out and out, black and white answer to that question."

Gerloff Deposition, pp. 74–75.

Wilson did not elaborate on the reasons why, if the assignment of proceeds form would be appropriate in connection with an unconditional letter of credit, such a form was irrelevant in the case of a conditional letter of credit which ostensibly would be rendered unconditional by the attachment of certificates of performance. The Court infers that, although Scarsdale did not deem the assignment necessary for the bank's negotiation of the letter of credit, it was its routine practice to obtain an acknowledgment of an assignment from the bank issuing the letter of credit. The failure to receive such an acknowledgment, after requesting one, is indicative that Scarsdale knew that Toronto-Dominion was, at best, uncertain whether it could honor a transfer of the credit.

As noted above, Toronto-Dominion issued the letter of credit on February 8, 1980. On or about February 13, 1980, Goldman met with Wilson to discuss the letter of credit as collateral for the new loan. Wilson reviewed the letter of credit and informed Goldman that it was not acceptable because it was conditioned on performance by Web. Wilson, however, had known since January 25 that the letter of credit was to be conditioned on performance. Wilson's January 25 file memorandum does not mention the April 1 expiration date and apparently Wilson did not know of the cutoff until the February 13 meeting, although he did know that performance was not expected to be completed until April 10. Goldman tried to persuade Wilson that Web could perform prior to April 1, and Wilson refused to accept the collateral subject to the risk of nonperformance by Web.

Goldman and Wilson then conferred as to how to render the letter of credit acceptable as collateral. Wilson suggested that a new, unconditional letter be issued or that the existing letter be amended. These suggestions were discarded, however, because of the amount of time involved in effectuating such changes through a Canadian bank. The two men then discussed whether Graphic Centre would execute the certificates in advance of performance. If so, Wilson believed that because delivery of the certificates with the drafts would be under Scarsdale's control, Graphic Centre, not Web or the bank, would face the risk of nonperformance by Web. Wilson and Gerloff agreed that the bank would accept as collateral the letter of credit, combined with the certificates and the drafts endorsed to the order of Scarsdale.

By a combination of persuasion and guile, Goldman succeeded in inducing Graphic Centre to execute the certificates and then obtaining possession of them and delivering them to Scarsdale. On February 14, 1980, Licht told Richard Winter ("Winter"), of

the Toronto law firm of Beard, Winter, Gordon which represented Graphic Centre, that he was concerned that the certificates had not been prepared. Licht expressed a fear that because the certificates were not in existence, Graphic Centre might improperly refuse to certify the performance when complete. Winter agreed to prepare the certificates and have them signed and sealed by Graphic Centre and delivered to Winter's law firm to be held in trust until completion of the corresponding stage of performance. Licht then left on vacation on February 15.

On February 19, Goldman called Winter saying that Licht was away and he needed to discuss transmittal of the certificates to New York. Goldman told Winter that Scarsdale was not convinced that the certificates existed and asked Winter to send them to him. Winter was not familiar with the Web-Scarsdale banking arrangements, but assumed that Goldman had pledged the letter of credit as security for an existing loan. Winter refused to send the certificates to Goldman since Goldman would be able to present the drafts for credit immediately, thus circumventing the performance requirement. After consulting with his client, however, Winter agreed to send the certificates to Licht, who was to hold them in trust until Winter's firm authorized their release. Wilfred Walters ("Walters"), president of Graphic Centre, testified that he agreed to have the certificates sent to Licht in trust because Graphic Centre was under time pressure to acquire the press from Web in order to perform its printing

contracts, and because he had been assured by Winter that the trust arrangement was safe. Winter sent Licht the certificates under cover of a letter dated February 21, 1980.[8] Winter knew Licht to be on vacation at the time the certificates were mailed, but he believed that Licht would be back in the office by the time the certificates arrived.

On February 25 or 26, Goldman went to Licht's office and obtained the original certificates. Goldman delivered the certificates to Scarsdale at the closing of his loan on February 26. Wilson was also away on vacation at that time,[9] but before leaving, he had arranged for Howard Falvey ("Falvey"), a Scarsdale assistant vice president, to handle the closing. Wilson instructed Falvey to close the loan only if Goldman produced all the documents required under the letter of credit.

At the closing, Goldman gave Falvey the letter of credit and the three certificates. Goldman did not present the drafts required under the letter of credit; when questioned by Falvey, Goldman stated that none had been prepared and requested that he be allowed to delay signing the drafts until the letter of credit was submitted for payment. Falvey refused this request and asked a clerk from Scarsdale's letter of credit department to prepare the drafts.

Falvey testified that Goldman told him that there was a problem in accomplishing one of the requirements described in the certificates. Falvey's testimony was as follows:

> "Q. What did you say when he told you that?
>
> U.S. After seeking instructions from our client we contacted Mr. Goldman and we agreed with Mr. Goldman that the three certificates would be sent to your office on the following terms:
> "... The signed and sealed corporate certificates would be held by you as attorney for Web Equipment Sales, Inc. in escrow and trust to be released to the Toronto-Dominion Bank pursuant to the provisions under their letter of credit dated February 8, 1980 but that such release would only be done upon the telexed authority from our firm addressed to you that you could in fact release the said certificates."
> Ex. 74.

---

**8.** The letter stated, in part:

"... [O]n February 19 and February 20 Mr. Goldman—your client—called your writer directly. Normally, your writer would have refused to speak to him since it is contrary to our general practice to speak directly to a person who is represented by counsel. However, since you were away on your holidays and no one else at your office was able to assist Mr. Goldman, we spoke to him directly.

"Mr. Goldman requested that the actual certificates (not photocopies as requested in your letter) be attached to the letter of credit. We pointed out to him that unless there was some condition attached to sending these certificates that he could immediately deliver them to the bank and receive the full amount of $265,000

**9.** Wilson left on vacation on February 18, 1980.

"A. I said, 'Why would the person making the certificate sign such a certificate when in fact there seems to be a problem or a delay,' or whatever it might have been, 'with certifying'?

"Q. What did he say?

"A. He said absolutely nothing. He just shrugged his shoulders.

"Q. And you accepted that as a response?

"A. Yes.

"Q. Did you pursue it at all with him or just let it go at that?

"A. I just let it go at that."

Falvey Deposition, pp. 58–59.

Scarsdale made the $250,000 loan to Web, evidenced by a demand note. At no time prior to making the loan did Wilson or any other Scarsdale officer contact Graphic Centre to verify that it intended to waive the performance conditions. Wilson testified that it did not occur to him to call Graphic Centre and inquire whether it was proper to accept the certificates because he believed that timing was of the essence for both Web and Graphic Centre.

Wilson also testified as follows regarding his belief concerning Graphic Centre's execution and delivery of the certificates:

"Based on the conversations I had with Mike Goldman I was aware of the time element and the time pressure which both Web and Graphic were under to complete the contract, and because of Scarsdale National's requirements that the letter of credit must be rendered entirely unconditional and irrevocable that Mike had convinced Graphic that it was the only basis on which Web could obtain any credit, and, therefore, Graphic acquiesced to executing the documents."

Trial Transcript pp. 49–50.

Wilson testified that he believed that Graphic Centre had effectively waived its right to insist on performance before payment. This testimony, however, must be reviewed in the context of Wilson's friendship with Goldman. Moreover, such testimony is at least potentially self-serving.

On March 14, 1980, Scarsdale presented to the New York Agency of Toronto-Dominion the first draft for $100,000 together with the first certificate and the letter of credit. Five days later, a check was issued in payment of this first draft. At this time the first stage of performance had been completed. Wilson's letter to Toronto-Dominion requesting payment of the first $100,000 did not state that the check should be made payable to Scarsdale rather than Web; the resulting check was made payable to Web. Consequently, no one at Toronto-Dominion or Graphic Centre was alerted to the fact that Scarsdale held the remaining certificates and claimed the right to payment under the letter of credit.[10]

By letter dated March 28, 1980, Scarsdale presented for payment the remaining two drafts, the corresponding certificates and the letter of credit. Toronto-Dominion refused payment of the remaining $165,000. This $165,000 was deposited by Toronto-Dominion into the Court's registry. Web did not compute the remaining two stages of performance.[11]

*Discussion*

■ Article 5 of the Uniform Commercial Code ("U.C.C.") sets forth the duties and obligations of the issuer of the letter of credit. A letter of credit is a commitment on the part of the issuing bank that it will pay a draft presented to it under the terms of the credit, and if it is a documentary draft, upon presentation of the required document. U.C.C. § 5–103. This obligation of the issuer to pay the beneficiary generally is independent of any obligation

10. Indeed, with the help of Goldman's attorney, Licht, Graphic Centre was purposefully kept in the dark. When Winter's associate called Licht to complain that the first certificate had been released prior to the Telexed authority required under the escrow agreement, Licht apologized, saying that the certificate had been presented in error. Since the first stage of performance had occurred, however, Winter let the matter drop.

11. Apparently, Web and/or Goldman defaulted on the outstanding loans due Scarsdale.

involved in the underlying sales contract. U.C.C. § 5–114(1); White and Summers, Uniform Commercial Code, § 18–2 pp. 711–12. The letter of credit itself is not a negotiable instrument, although the drafts under it may be. *Id.* at 715.

Despite this general rule, the U.C.C. recognizes certain exceptions that excuse the issuing bank from honoring drafts under a letter of credit. Subdivision (2) of Section 5–114 of the U.C.C. provides that

"[u]nless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation or transfer of a document of title (Section 7–507) or of a security (Section 8–306) or is forged or fraudulent or there is fraud in the transaction

"(a) the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course (Section 3–302) and in an appropriate case would make it a person to whom a document of title has been duly negotiated (Section 7–502) or a bona fide purchaser of a security (Section 8–302); and

"(b) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor."

Thus, the first step in determining whether Toronto-Dominion justifiably refused to make payments under the final two drafts is to determine whether there was "fraud in the transaction." In *United Bank Limited v. Cambridge Sporting Goods Corp.*, 41 N.Y.2d 254, 392 N.Y.S.2d 265, 360 N.E.2d 943 (1976), the New York Court of Appeals commented that Section 5–114(2)

"represents a codification of precode case law most eminently articulated in the landmark case of *Sztejn v. Schroder Banking Corp.*, 177 Misc. 719, 31 N.Y.S.2d 631, Shientag, J., where it was held that the shipment of cowhair in place of bristles amounted to more than mere breach of warranty but fraud sufficient to constitute grounds for enjoining payment of drafts to one not a holder in due course . . . . Even prior to the *Sztejn* case, forged or fraudulently procured documents were proper grounds for avoidance of payment of drafts drawn under a letter of credit (Finkelstein, Legal Aspects of Commercial Letters of Credit, pp. 231–236–247 . . . ."

*Id.* 372 N.Y.S.2d at 270–71, 360 N.E.2d at 948–49 (citations omitted). The Court also noted that the drafters of the Section, in attempting to codify the *Sztejn* case and in utilizing the phrase "fraud in the transaction," rejected a dogmatic approach in favor of a flexible standard "to be applied as the circumstances of a particular situation mandate." *Id.* at 271, 360 N.E.2d at 949 (footnote omitted).

Based on the facts of the present case, it is clear that the defense of "fraud in the transaction" has been established. The procurement of the certificates by Goldman on the representation that they would be held in trust by his attorney, Licht, with the obvious intent of removing them from the attorney's office and delivering them to Scarsdale, clearly constituted fraud. Although "[i]t can be difficult to draw a precise line between cases involving breach of warranty (or a difference of opinion as to the quality of goods) and outright fraudulent practice on the part of the seller," see *id.*, this case presents no such difficulty.

The conclusion that the "fraud in the transaction" defense applies shifts the burden of proof back to Scarsdale to show that it is a holder in due course. *Id.* at 272, 360 N.E.2d at 950. U.C.C. Section 3–307(a)(3), which governs the pleading and proof of holders in due course status, provides

"(3) After it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he or some person under

whom he claims is in all respects a holder in due course."

In *United Bank Limited,* the New York Court of Appeals held that with respect to letters of credit, the defenses listed in Section 5–114(2) operate to shift the burden of proof of holder in due course status upon the party asserting such status.[12] *Id.* See also *Banco Espanol de Credito v. State St. Bank & Trust Co.,* 409 F.2d 711 (1st Cir. 1969).

A holder in due course is a holder who takes an instrument (1) for value, (2) in good faith, and (3) without notice that it is overdue or has been dishonored or of any defense or claim against it on the part of another. U.C.C. § 3–302(1). There is no question that Scarsdale gave value for the drafts and accompanying letter of credit and certificates. Thus, the question here is whether the events leading up to the negotiation of the drafts and the granting of the loan were sufficiently indicative of irregularities so as to put Scarsdale on inquiry as to the purposes for which Goldman was acting. *Cf. Chemical Bank v. Haskell,* 51 N.Y.2d 85, 432 N.Y.S.2d 478, 480, 411 N.E.2d 1339, 1341 (1980).

■ Good faith is defined by the U.C.C. as "honesty in fact in the conduct or transaction concerned." U.C.C. § 1–201.[13] The New York Court of Appeals, noting that this language was intended as a subjective standard, ruled that

"the inquiry is not whether a reasonable banker in Chemical's position would have known, or would have inquired concerning the alleged breach by Stanndco of its partnership duties, but rather, the inquiry is what Chemical itself actually knew. If Chemical did not have actual knowledge of some fact which would prevent a commercially honest individual from taking up the instruments, then its good faith was sufficiently shown."

*Chemical Bank v. Haskell,* 432 N.Y.S.2d at 480, 411 N.E.2d at 1341 (citation omitted). Bad faith, then, represents more than a failure to observe reasonable commercial standards. As this Court has previously ruled, the circumstances of which the holder is aware must be such that the failure to inquire signals a desire to evade knowledge because of a belief or fear that the inquiry would reveal a defense. *Corporacion Venezolana de Fomento v. Vintero Sales,* 452 F.Supp. 1108, 1119 (S.D.N.Y.1978), *remanded on other grounds,* 607 F.2d 994 (2d Cir. 1979).

Applying these principles to all the evidence in this case and to my judgment as to the credibility of the witnesses, I find that Scarsdale is not a holder in due course of the drafts. Scarsdale had actual knowledge at the time the loan was made that the performance required by the certificates had not yet occurred. Scarsdale knew that Web was in financial difficulty. Scarsdale knew that Toronto-Dominion had not returned the assignment of proceeds form.[14] Scarsdale also knew that Goldman did not want to prepare the drafts until they were necessary for the bank to draw against the

---

**12.** When it is shown that a defense exists, one seeking to claim the rights of a holder in due course "has the full burden of proof by a preponderance of the total evidence" on this issue. The burden must be sustained by "affirmative proof" of the elements of holder in due course status. See Official Comment, McKinney's Cons.Laws of N.Y., Book 62½, U.C.C. § 3–307, p. 212.

**13.** Notice is defined in U.C.C. § 1–201(25).

"A person has 'notice' of a fact when (a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists."

The concepts of good faith and notice generally are blurred by the case law since by definition circumstances sufficient to place one on notice are sufficient to establish the absence of good faith. See, *e.g., Hollywood National Bank v. IBM,* 38 Cal.App.3d 607, 613, 113 Cal.Rptr. 494, 497 (1974).

**14.** Scarsdale strenuously argues that the assignment of proceeds form as well as Becher's testimony is irrelevant since the bank dropped the idea of taking the collateral by assignment. While it is true that the assignment was not necessary for the eventual transaction, Toronto-Dominion's failure to acknowledge a routine assignment and Becher's testimony are relevant both as to what Scarsdale knew and Wilson's credibility on that issue.

letter of credit. Moreover, Wilson, the bank officer in charge of the Web account, was a close friend of Goldman's.

Scarsdale contends that the fact that it knew that the conditions of the amended contract had not been performed is irrelevant. The Court disagrees. The terms of the amended contract were the terms of the letter of credit; the certificates were designed to assure Toronto-Dominion that the performance had taken place before it made payments under the letter of credit. The fact that the conditions of the amended contract were not satisfied meant that the conditions of the letter of credit had not been satisfied, despite technical compliance with the paper requirements. While paper compliance normally would be sufficient, the issue here is what Scarsdale knew at the time it took the certificates and drafts and whether its failure to make any inquiry constitutes willful ignorance.

Scarsdale contends that when Goldman produced the certificates at the closing on February 26, 1980, the bank naturally assumed that Goldman had been successful in convincing Graphic to execute and deliver the certificates to him for the precise purpose of pledging them to the bank. According to Scarsdale, there was no other logical assumption as to how Goldman had managed to obtain the original certificates. The question is, however, whether that "assumption" was made in good faith in light of the facts Scarsdale knew at the time or whether it was made in "willful ignorance." The Court concludes the latter. Scarsdale could scarcely have been oblivious to the much more logical assumption that Graphic Centre would not waive the condition of performance prior to payment. It seems highly unlikely that the terms of the credit would be amended by means of issuing false certificates. Despite the time pressure that made it unfeasible to wait for a new letter of credit to be issued, the unusual procedure should have alerted Scarsdale to further inquiry.

In a case decided under Section 95 of the New York Negotiable Instruments Law, which contained essentially the same language as U.C.C. § 3–304, then District Judge Feinberg considered the consequences of a holder's failure to inquire under circumstances analogous to those at issue here. In *Otten v. Marasco*, 235 F.Supp. 794 (S.D.N.Y.1964), *aff'd*, 353 F.2d 563 (2d Cir. 1965), the Court considered whether the holder of stolen bearer bonds was a holder in due course. The holder ("Weingart") accepted the bonds as collateral for a loan knowing that the bonds did not belong to the pledgor ("Littman"). Weingart also knew that Littman's company was having financial difficulty but did not investigate the truth of Littman's statement that he was free to use the bonds as collateral. The Court held that, under these circumstances, the holder failed to meet its burden of proof on the issue of good faith because he failed to make further inquiry upon learning that the bonds belonged to another.

In affirming the district court's decision, the Second Circuit stated:

"In the present case, Weingart knew that Harlem Food Products was in financial difficulties. Littman, the president of the company, told Weingart that the bonds did not belong to Littman or to Harlem Food Products, but belonged to the president of the Bakers Union. Under such circumstances, it was not improper to conclude that Weingart should have made some attempt to find out whether Littman was authorized to pledge the bonds, and that his failure to do so constituted 'willful ignorance' and therefore bad faith."

353 F.2d at 566.[15]

15. Scarsdale relies on *Banco Espanol de Credito v. State Street Bank and Trust Company*, 409 F.2d 711 (1st Cir. 1969). In that case, the contract between the buyer and seller required that the goods ordered "be a sample inspected in Spain." The sample was to be approved by the buyer (the applicant for the letter of credit) and then inspected by an independent inspection agency which would then issue an inspection certificate that was required to be presented by the seller (the beneficiary) with the draft drawn under the letter of credit.

In this case, Wilson testified that he did not place a call to Graphic Centre to inquire as to whether Scarsdale could treat the certificates, which recited facts that Scarsdale knew were not accurate, as waiving the conditions of the credit because "timing was of the essence" from the view of both Web, and according to Michael Goldman, Graphic Centre. Trial Transcript, p. 54. The evidence shows, however, (1) that Wilson knew on February 13 that Goldman would try to obtain all the certificates even though performance was not expected until April 10, and (2) that the loan was not disbursed until February 26, thirteen days later. Moreover, Scarsdale's prior decision in late 1979 to modify its lending terms to Web suggests the bank's awareness of the company's deteriorating financial position.

Scarsdale further contends that it did not have a duty of inquiry, citing *Chemical Bank, supra.* In that case, the Court of Appeals stated that

> "[t]here was no obligation on Chemical, as a purchaser of negotiable paper, to investigate the financial position of its transferor, or the progress of the underlying construction project."

432 N.Y.S.2d at 481, 411 N.E.2d at 1342. In this case, however, Scarsdale did not have to investigate Web's financial position; Scarsdale knew that Web needed the loan to complete the contract and had restricted its lending policy toward Web in October 1979. Nor did Scarsdale need to investigate

the progress of the underlying project; Scarsdale knew that performance had not occurred. Moreover, Scarsdale knew that Toronto-Dominion had not approved an assignment and that Goldman wanted to delay preparation of the drafts until the bank had put the letter of credit in for negotiation. Without knowing of the fraud itself, it is difficult to imagine how much more would be required to give Scarsdale "actual knowledge of some fact which would prevent a commercially honest individual from taking up the instruments...." [16]

## Conclusion

For the reasons stated above, the Court finds that Scarsdale is not entitled to draw on the letter of credit. Accordingly, judgment should be entered on behalf of Graphic Centre, the interpleaded defendant. The remaining claims, Graphic Centre's third-party claims against Goldman, Licht and Licht's partners and Licht's cross-claims against Goldman, are dismissed.

Settle order on 10 days' notice.

The seller fraudulently represented to the inspection agency that the sample had been approved by the buyer, and, upon discovering this, the buyer sent a series of cables to the inspection agency asserting that the buyer had not approved the samples, which were subsequently included on the face of the inspection certificate. The Court ruled that Banco Espanol was a holder in due course despite this notice because the inspection agency and Banco Espanol assumed that the samples had been inspected and that the cables were merely the buyer's second thoughts. Critical to the Court's reasoning, however, was the precise language of the orders. See *id.* at 713. Moreover, there is no indication that the inspection agency or Banco Espanol had knowledge of any other relevant facts, unlike the case at issue here.

16. Scarsdale also argues that Graphic Centre should be estopped to deny its right to draw under the letter of credit based on the common law rule of equitable estoppel. That rule states that when one of two innocent persons has to suffer a loss caused by a wrongdoer, the person who enables the wrongdoer to cause the loss must sustain it. See *Bunge Corp. v. Manufacturers Hanover Trust Co.*, 31 N.Y.2d 223, 335 N.Y.S.2d 412, 286 N.E.2d 903 (1972). According to Scarsdale, Graphic Centre made the misappropriation possible by sending the certificates to Licht. The Court disagrees, however, that Graphic Centre was more responsible for causing the loss than was Scarsdale; the bank had more information and should have been alerted by the unusual procedures to make further inquiry. Thus, Scarsdale also had the greatest opportunity to avoid the situation.