836 F.2d 545
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
BANK OF CREDIT AND COMMERCE INTERNATIONAL, S.A., Plaintiff-Appellee,
v.
Ahmad AKHAVAN, Defendant-Appellant,
Bontech Corporation, Saracoglu Engineering and Construction
Co., Ltd., Cetin Saracoglu, Orhan Saracoglu, Metin
Saracoglu, Nader Heyat, Khosrow Jahanshad, Marine &
Spedition Shipping, Ltd., N. Mahdavi, Fidelity Bank NA, Defendants.
BANK OF CREDIT AND COMMERCE INTERNATIONAL, S.A., Plaintiff-Appellee,
v.
Khosrow JAHANSHAD, Defendant-Appellant,
Bontech Corporation, Saracoglu Engineering and Construction
Co., Ltd., Cetin Saracoglu, Orhan Saracoglu, Metin
Saracoglu, Nader Heyat, Ahmad Akhavan, Marine & Spedition
Shipping Ltd., N. Mahdavi, Fidelity Bank NA, Defendants.
 Nos. 86-1250, 86-1255.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 5, 1987.
Decided Dec. 14, 1987.
 
 Bernard Joseph DiMuro (Hirschkop & Associates, P.C. on brief) for appellants.
 Lloyd Haley Randolph (Paul L. Friedman, White & Case on brief) for appellee.
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, JAMES DICKSON PHILLIPS, Circuit Judge, and BUTZNER, Senior Circuit Judge.
 BUTZNER, Senior Circuit Judge:
 
 
 1
 Ahmad Akhavan and Khosrow Jahanshad appeal a summary judgment in favor of Bank of Credit and Commerce International based on the submission of false invoices in order to collect under a letter of credit. We affirm.
 
 I.
 
 2
 Ahmad Akhavan and Khosrow Jahanshad were employed by Bontech Corporation, which was engaged primarily in the export of construction and agricultural machinery. Akhavan served as president of Bontech and Jahanshad as its sales engineer. Bontech entered into a contract with Saracoglu Engineering and Construction Co., Ltd., a Turkish construction company. In this contract Bontech agreed to act as Saracoglu's purchasing agent in the United States for the acquisition of construction materials costing $2 million. The contract stipulated that the materials would be shipped to Saudi Arabia. It also provided that payment to Bontech would be made through a bank draft by a bank acceptable to Bontech and guaranteed by a stand-by letter of credit.
 
 
 3
 Saracoglu applied to the Bank of Credit and Commerce International, S.A. (BCCI), through its London, England, office for a letter of credit of $2 million. Saracoglu informed BCCI that the materials it was purchasing from Bontech would be used for Saudi construction projects. Saracoglu also informed BCCI that its clients in Saudi Arabia would pay 70 percent of the price of the materials as soon as Bontech delivered them to the construction site and agreed to assign that payment to BCCI as security for the letter of credit. On the basis of these representations BCCI issued the letter of credit, naming Bontech as beneficiary. BCCI then designated Fidelity Bank, N.A., a Philadelphia bank, to act as BCCI's advising and and confirming bank in the United States under the letter of credit. Fidelity agreed that it would pay Bontech in 18 monthly installments after Bontech presented documents that complied with the letter of credit. BCCI agreed to reimburse Fidelity, with interest, for each of these installments.
 
 
 4
 Unknown to BCCI, however, Bontech and Saracoglu entered into a separate agreement to overinvoice the items to be shipped by Bontech to Saudi Arabia and, in Akhavan's words, "to use the difference between the actual cost of those [items] and the amount of the letter of credit to purchase and ship the goods to Libya." BCCI had encountered difficulties with Saracoglu's Libyan branch because of foreign exchange controls, payment delays, and other policies imposed by the Libyan government.
 
 
 5
 In accordance with this scheme, Bontech presented documents to Fidelity which falsely reflected that it shipped certain goods to Saudi Arabia and falsely stated that Saracoglu's price for the goods was $1,999,959--approximately 10 times more than the actual price. Fidelity, after some hesitation, accepted the documents and ultimately paid Bontech $2,072,984.55. Under the terms of the letter of credit, BCCI made seven installment payments to Fidelity totaling $980,581 before it discovered that the documents were false. It then ceased making payments.
 
 
 6
 BCCI filed suit against Bontech, Akhavan, and Jahanshad, claiming that they defrauded it of $2 million by submitting the false documents to Fidelity. BCCI also claimed that Bontech, Akhavan, and Jahanshad, among others, conspired to defraud BCCI, that Bontech breached an implied warranty that the necessary conditions of the letter of credit had been met, and that Akhavan and Jahanshad violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Sec. 1961 et seq. The district court granted BUCCI's motion for summary judgment on all counts, concluding that Bontech, Akhavan, and Jahanshad committed an "intentional ... [and] egregious fraud." The court awarded $780,581 in damages, trebled for the RCIO counts, plus costs and attorneys' fees. Bontech filed for bankruptcy and stayed the proceedings against it in the district court.
 
 II.
 
 7
 In reviewing the district court's decision to grant summary judgment for BCCI, we are obliged to employ the same standards as those guiding the original decision to grant the motion. Smith v. University of North Carolina, 632 F.2d 316, 338 (4th Cir.1980). Thus, like the district court, we must be satisfied that the moving party, BCCI, demonstrated the absence of any genuine issue of material fact and that the facts presented entitled it to judgment as a matter of law. Gill v. Rollins Protective Services Co., 773 F.2d 592, 594 (4th Cir.1985). If BCCI properly supported its motion, Rule 56(e) required the nonmoving parties, Akhavan and Jahanshad, to produce "specific facts showing that there is a genuine issue for trial." If there was no genuine issue of material fact, and if BCCI was entitled to judgment as a matter of law, entry of summary judgment in its favor was proper. See Anderson v. Liberty Lobby Inc., 106 S.Ct. 2505, 2510-12 (1986).
 
 
 8
 Because Pennsylvania and Virginia impose similar requirements on BCCI to sustain an action against Akhavan and Jahanshad for fraud, we need not decide which state's law actually governs this case. Under either state's law BCCI must prove that, on behalf of Bontech, Akhavan and Jahanshad 1) made false statements of material facts; 2) they knew these statements were false; 3) they intended to deceive or mislead BCCI by their false statements; and 4) BCCI relied on their false statements to its detriment. Thomas v. Seaman, 451 Pa. 347, 304 A.2d 134, 137 (1973); Winn v. Aleda Construction Co., Inc., 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984). The materials that BCCI submitted to the district court in support of its motion for summary judgment--affidavits and depositions of Akhavan and Jahanshad, false invoices, and the letter of credit--provided the court with indisputable facts from which it properly concluded that each of these elements had been met.
 
 
 9
 Regarding the first element of fraud, the proof conclusively establishes that Bontech, at Akhavan's and Jahanshad's direction, made false statements of material fact to BCCI. Akhavan directed Jahanshad to prepare invoices that both now readily admit exaggerated by 10 times the amount that Bontech was actually charging Saracoglu for the construction materials it shipped to Saudi Arabia. Akhavan and Jahanshad maintain that the invoices were not false because Saracoglu's representative, Nader Heyat, approved them. However, as long as the two admit that the amount Bontech actually charged Saracoglu was less than the amount indicated on the invoices, the invoices are false. The fact that Nader Heyat approved them does nothing for Bontech; it only adds support to BCCI's claim that Saracoglu conspired with Bontech to defraud BCCI.
 
 
 10
 Likewise, Akhavan's affidavit, Bontech's written agreements with Saracoglu, and the depositions of both Akhavan and Jahanshad provide facts from which the district court properly concluded that Akhavan and Jahanshad knew that the invoices were false. Both signed the papers in which Bontech and Saracoglu agreed to overinvoice, and both did not deny that they knew the actual prices of the goods. Accordingly, the facts amply establish the second fraud element--knowledge that the statements were false.
 
 
 11
 Similarly, the facts presented to the district court remove all doubt that Akhavan and Jahanshad intended to deceive BCCI by submitting the false invoices. Akhavan stated in his affidavit that Bontech "agreed to over invoice ... up to a total of U.S. $2,000,000 by ($1,785,289.00) and use the funds available as a result of the ... transaction" to purchase materials for Saracoglu's Libyan projects. Thus, Akhavan wanted BCCI to believe that Bontech was doing one thing (shipping goods to Saudi Arabia) when in fact it was doing another (shipping goods to Libya). Clearly, then, the facts support the district court's conclusion that the invoices were prepared with the intent to deceive.
 
 
 12
 Finally, the facts indicate that BCCI relied on Bontech's false statements to its detriment. Bontech presented false documents to Fidelity, who in turn forwarded them to BCI. In reliance upon them, BCCI paid Fidelity $980,581 pursuant to the letter of credit. Bontech, accordingly, was injured in the amount of $780,581--the $200,000 difference being approximately the actual price that Saracoglu paid for the goods Bontech shipped to Saudi Arabia. Therefore, with the undisputed facts supporting each of the necessary elements of BCCI's claim, the district court properly granted the motion for summary judgment.
 
 III
 
 13
 Akhavan and Jahanshad argue that the facts present one of two possible scenarios and that a jury must ultimately decide which actually took place, precluding summary judgment. They suggest that the facts indicate that either 1) Akhavan and Jahanshad were "duped" by Saracoglu into submitting false invoices to BCCI; or 2) BCCI and Saracoglu constructed a fail-safe scheme to collect from the Libyan government on Saracoglu's Libyan construction projects by having the construction materials necessary to complete the projects shipped to Libya while at the same time avoiding foreign exchange controls or other problems that the Libyan government might cause if a letter of credit was issued to Saracoglu's Libyan branch. In our opinion, however, the facts presented to the district court are not ambiguous. The appellants' first theory is irrelevant even if true, and the second is simply not supported by any evidence or by any reasonable inference that can be drawn from the evidence.
 
 
 14
 The first scenario advanced by Akhavan and Jahanshad, even if within the realm of possibility, is irrelevant to the fraud claim. The possibility that Saracoglu may have "duped" Bontech into submitting false invoices to BCCI does not negate the fact that the appellants knew that the invoices were false and that they agreed to submit them in order to mislead BCCI. Akhavan and Jahanshad provide no facts suggesting that BCCI knew of the arrangement and, as BCCI points out in its brief, as long as that is the case they cannot escape liability for fraud by arguing that they were "duped" and did not intend to injure BCCI. Intent to injure is not an element of fraud, but intent to mislead is. W.P. Keeton, Prosser and Keeton on Torts 741 (5th ed. 1984).
 
 
 15
 The second scenario is easily dismissed. The facts do not suggest, as Akhavan and Jahanshad argue, that BCCI and Saracoglu constructed a scheme to collect from the Libyan government. All of the evidence, including the appellants' own statements, points to false invoice agreements made by Bontech and Saracoglu--not by Saracoglu and BCCI.
 
 
 16
 Akhavan and Jahanshad also allege that Fidelity knew that the invoices were false. They argue that this knowledge should be attributed to BCCI because Fidelity was its advising and confirming bank, and that BCCI therefore did not rely on the false invoices.
 
 
 17
 We cannot accept this argument. Fidelity's obligation as an advising bank was simply to notify Bontech of the letter of credit. See Va.Code Secs. 8.5-103(e) and 8.5-107(1) (U.C.C.). Even if Fidelity knew that the invoices were false, that knowledge should not be attributed to BCCI because of Fidelity's status as an advising bank. Fidelity, as a confirming bank, has the same obligations to BCCI, the issuing bank, as BCCI has to Saracoglu, its customer. Banque Paribas v. Hamilton Industries International, 767 F.2d 380, 384 (7th Cir.1985). It owes a duty to BCCI, therefore, to examine documents with care in order to ascertain that on their face they comply with the letter of credit. See Va.Code Sec. 8.5-109(2) (U.C.C.). It is also required to exercise good faith in reaching that determination. Lustrelon, Inc. v. Prutscher, 178 N.J.Super. 128, 428 A.2d 518, 525-27 (App.Div.1981). If, as Akhavan and Jahanshad assert, Fidelity knew that the invoices did not comply with the letter of credit, it breached its duty of good faith to BCCI and its knowledge should not be imputed to BCCI. Akhavan's and Jahanshad's assertion that Fidelity knew that the invoices were false does nothing more than support BCCI's position that it should not have to continue making payments to Fidelity under the letter of credit. Cf. Scarsdale National Bank & Trust v. Toronto-Dominion Bank, 533 F.Supp. 378, 386 (S.D.N.Y.1982) [issuing bank justified in refusing to make payments under letter of credit when presenting bank had actual knowledge that its terms had not been met].
 
 
 18
 Finally, Jahanshad's assertion that he was not a "decisionmaker" at Bontech does not absolve him from personal liability for preparing and submitting the false invoices to BCCI. A plaintiff may recover for fraud not only against the principal perpetrator but also against any individual who aided the perpetrator of the fraud. Ging v. parker-Hunter Inc., 544 F.Supp. 49, 52 (W.D.Pa.1982). "An actual participant in a fraud is no less a principal because someone else originated the plan." IIT v. Cornfeld, 619 F.2d 909, 918 (2d Cir.1980).
 
 
 19
 The judgment of the district court is affirmed.