Ralph J. OTTEN, Plaintiff,

v.

Anthony R. MARASCO, the United States Marshal for the Southern District of New York and the United States of America, Defendants,

M. Alden Weingart, Intervening Defendant.

United States District Court
S. D. New York.
Nov. 23, 1964.

Whitman, Ransom & Coulson, New York City, for plaintiff. Kevin Thomas Duffy, and Melvin Shulman, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, for defendants. Thomas H. Baer, Asst. U. S. Atty., of counsel.

Landes & Wingate, New York City, for defendant-intervenor. Irwin J. Landes, and Morton H. Rosen, New York City, of counsel.

FEINBERG, District Judge.

Plaintiff Ralph J. Otten, a citizen of Pennsylvania, seeks to recover twenty-five $1,000 negotiable bearer bonds,[1] which are now in the possession of defendants, the United States and the United States Marshal for the Southern District of New York, Anthony R. Marasco. These defendants occupy the position of disinterested stakeholders. The opposing real party in interest is defendant-intervenor Dr. M. Alden Weingart, a resident of New York, who claims the bonds.

Otten was the owner of the bonds on July 28, 1958, when they were stolen from his home in Pennsylvania. In September 1958, Dr. Weingart was asked by David Littman, president of Harlem Food Products, Inc., to lend $15,000 to that corporation, a tenant in a building owned by the doctor. The doctor had retired in 1954 from the practice of dentistry for reasons of health, and in the following four years his source of income had been business ventures and investments. Dr. Weingart had recently disposed of his interest in Harlem Food Products to establish a tax loss and was aware of that company's poor financial condition. Accordingly, the doctor agreed to make the loan only if he received collateral. Littman turned over twenty $1,000 bonds to the doctor and told him that, although they belonged to the president of the Bakers Union, he was free to employ them as collateral. The doctor promptly pledged the bonds with the Sterling National Bank as collateral for a $10,000 loan to him. This sum, along with $5,000 more from the doctor, furnished the funds for Dr. Weingart's $15,000 loan to Harlem Food Products. This loan was consummated by two checks drawn by the doctor, one for $11,000 and the other for $4,000, payable to Sidney Retter, an employee of Harlem Food Products. The checks were turned over to Littman. The device of not formally loaning the money to Harlem Food Products was used to

---

1. There are ten $1,000 Massachusetts Turnpike Authority Bonds, ten $1,000 Illinois State Toll Highway Commission Bonds, and five $1,000 Florida State Turnpike Authority Bonds.

protect the doctor's tax loss on his prior disposition of his interest in that corporation. No note was given for this loan. The doctor did not investigate the veracity of Littman's assertion that the bonds were the property of the Bakers Union's president and that he was free to use them as collateral.

In December 1958, Dr. Weingart redeemed the bonds from the Sterling National Bank and returned them to Littman so that they might be used in "a year-end audit." [2] At that time, no payments had been made on the loan. On January 15, 1959, Littman prevailed upon the doctor to extend to Harlem Food Products a further loan of $5,000. This was accomplished by a check payable to Ben Block, a man with no financial interest in the corporation. In return, the doctor received as collateral the entire $25,000 of the bonds here in suit. No note was given for this loan.

In June 1959, shortly before leaving for a European vacation, the doctor made a further loan of $5,000 to Harlem Food Products. A note from a good customer of Littman was promised as collateral but was never received. In late August, soon after the doctor returned to the United States, he deposited for collection five coupons of the Florida State Turnpike Authority Bonds. Some coupons then due were not deposited. The doctor did not at that time formally declare the bonds themselves forfeit or attempt to levy on this collateral in any other way.

A few days later, special agent Eugene Fitzpatrick of the Federal Bureau of Investigation called upon Dr. Weingart and informed him that the bonds were stolen. The agent testified that he in-

quired of the doctor where the bonds were, but that the doctor professed ignorance of their whereabouts. Fitzpatrick told Dr. Weingart that he was going directly to see Littman and requested the doctor not to contact Littman because it would interfere with the investigation. When Fitzpatrick arrived at Littman's office, the latter was not present, but the agent was permitted to enter. Upon the desk he saw a message urgently requesting Littman to call Dr. Weingart. At trial, the doctor testified that the agent did not ask him where the bonds were and that he did not telephone Littman until much later in the day.

In the latter part of 1959, Harlem Food Products went into bankruptcy proceedings in this court. On February 9, 1960, the doctor filed a proof of claim for $25,000, in which he swore that no part of the debt had been paid and "that claimant does not hold, and has not, nor has any person by his order, or to deponent's knowledge or belief for his use had or received any security or securities for said debt (or liability)." On May 6, 1960, eight months after the doctor allegedly learned for the first time that the bonds were stolen, he arranged for their delivery to the F.B.I. After a grand jury refused to indict anyone for an offense in connection with the theft of the bonds, the bonds were turned over to the United States Marshal for distribution.

 Both sides appear to agree that the applicable law is the law of the State of New York [3] and that the New York law involved is the Negotiable Instruments Law. [4] The legal question to be determined is whether Dr. Weingart is a holder in due course of these stolen bonds. [5] To attain this status, one must

---

2. Transcript p. 19.

3. The complaint relies upon diversity and the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 for jurisdiction. On either basis, it would appear that New York law controls. United States v. Guaranty Trust Co., 293 U.S. 340, 345-346, 55 S.Ct. 221, 79 L.Ed. 415 (1934); Hutchison v. Ross, 262 N.Y. 381, 187 N.E. 65, 89 A.L.R. 1007 (1933).

4. The relevant events occurred prior to September 27, 1964, the effective date in New York of the Uniform Commercial Code, § 10–105.

5. There was no attempt by defendant-intervenor to establish a prior holder as one in due course.

become a holder before maturity of a complete and regular instrument for value in good faith and without notice of any infirmity in the instrument or defect in the title of the person negotiating it. N.Y.Negotiable Instruments Law, McKinney's Consol.Laws, c. 38, § 91. The court finds that the doctor became the holder of the negotiable bonds in suit prior to their maturity. When he gave checks which were subsequently cashed and received the bonds as collateral, he paid value for them. Interboro Brewing Co. v. Doyle, 165 App.Div. 646, 151 N.Y.S. 325 (1st Dep't 1915) aff'd, 221 N.Y. 699, 117 N.E. 1072 (1917) (per curiam). The crucial question is whether Dr. Weingart accepted the collateral in good faith and without notice of any defect in the title of the person negotiating the bonds. Since the bonds were indeed stolen, on this issue the burden of proof is on Dr. Weingart.[6] United States Fidelity & Guaranty Co. v. Goetz, 285 N.Y. 74, 79, 32 N.E.2d 798 (1941); Negotiable Instruments Law, § 98. The court finds that Dr. Weingart has not sustained his burden for the reasons set forth below.

Defendant-intervenor argues that, as a reputable orthodontist who practiced until 1954, he cannot fairly or sensibly be characterized as a man who would knowingly accept stolen bonds. Thus, defendant points out that he would not risk lending $15,000 to a firm he knew had financial difficulty on the strength of knowingly tainted collateral, and that his actions in immediately pledging the bonds with a bank to secure a loan and then later sending in five coupons for collection are inconsistent with guilty knowledge of the theft of the bonds.

Plaintiff contends that the evidence shows that Dr. Weingart did not act in good faith both in fact and in law. Plaintiff attacks the doctor's credibility on various grounds, pointing particularly to the sworn proof of claim in the bankruptcy proceedings, which stated that the claimant did not hold and had not re-

ceived any security for the loan, and to his statements and actions when approached by the F.B.I. Plaintiff also points to the unusual circumstances surrounding the loan, including the fact that there was no loan agreement or note, that the checks were not drawn to the order of the corporation, and that the bonds were returned to Littman for a "year-end audit."

It is not necessary to decide whether the doctor, at the time he received the bonds as collateral, had actual knowledge that the bonds were stolen, since knowledge of facts which should have led him to further inquiry may of itself defeat his status as a holder in due course. The crucial distinction has been phrased as that between "suspicious circumstances" and "facts that brought home to * * * [the alleged holder in due course] either knowledge or a duty to make further inquiry." Overseas Credit Corp. v. Cal-Tech Systems, Inc., 20 A.D.2d 355, 247 N.Y.S.2d 252, 255 (1st Dep't 1964). Exactly where to draw the line between these two concepts is a difficult question. There is language in the cases to the effect that bad faith is not mere carelessness and is "nothing less than guilty knowledge or willful ignorance." See Hall v. Bank of Blasdell, 306 N.Y. 336, 341, 118 N.E.2d 464, 467 (1954). On the other hand, in State of the Netherlands v. Federal Reserve Bank, 99 F.Supp. 655 (S.D.N.Y.1951), aff'd in part, 201 F.2d 455 (2d Cir. 1953), this court, in dealing with N.Y.Negotiable Instruments Law, § 91, quoted with approval the following language of the New York Court of Appeals:

> " 'Good faith' is used in this section in the legal or commercial sense. Rochester & C. Turnpike Road Co. v. Paviour, 164 N.Y. 281, 58 N.E. 114, 115, 52 L.R.A. 790. In determining the existence or non-existence of good faith, one must look at all the circumstances of the case. In Rochester & C. Turnpike Road Co. v. Paviour, supra, the court set up

6. Dr. Weingart concedes that once the court finds that the bonds were stolen, the burden of proof shifts to him. De-

fendant-intervenor's Memorandum of Law, p. 4.

the following test: 'Even if his [holder's] actual good faith is not questioned, if the facts known to him should have led him to inquire, and by inquiry he would have discovered the real situation, in a commercial sense he acted in bad faith, and the law will withhold from him the protection that it would otherwise extend. * * * One who suspects, or ought to suspect, is bound to inquire, and the law presumes that he knows whatever proper inquiry would disclose.' "
Id. at 667.

A good example of when inquiry may be necessary is provided by cases dealing with principal-agent situations. When a holder of a negotiable instrument receives it from a person he knows possesses it only as an agent, rather than as a principal, and also knows that the agent negotiates the instrument for his personal benefit, the holder is charged with bad faith and notice of any defect or infirmity in the instrument, and is not a holder in due course. Maber, Inc. v. Factor Cab Corp., 19 A.D.2d 500, 244 N.Y.S.2d 768, 771 (1st Dep't 1963) and cases cited therein. Cf. United States Fidelity & Guaranty Co. v. Goetz, 285 N.Y. 74, 78, 32 N.E.2d 798, 800 (1941) (jury question presented as to whether defendant brokers, who sold stolen bonds for a thief or his agent, "were put upon inquiry as to the nature of their principal's possession of the bonds and * * were, therefore, chargeable with constructive notice of the theft.")

In Munn v. Boasberg, 292 N.Y. 5, 53 N.E.2d 371 (1944), the New York Court of Appeals used the principal-agent analogy in reversing a finding that the holder of a negotiable instrument had acted in good faith in receiving it. In that case, plaintiff sued to recover from defendant the amount of a check drawn to defendant's order by plaintiff. One Shuman had fraudulently persuaded plaintiff to draw the check to the order of defendant claiming that he (Shuman) needed the money as a deposit in a business deal. Thereafter, Shuman repaid a debt to defendant by delivering the check to him. The court held that the trial court had erred in dismissing the complaint and refusing to let the jury decide the issue of good faith. The court pointed out that Shuman had no apparent title to the check and was, therefore, to be regarded as plaintiff's agent for the purpose of delivering plaintiff's check to defendant, that possession by Shuman of plaintiff's check drawn to defendant's order gave no appearance of authority to use the check for his own purpose, and that the check itself was constructive notice that the funds it represented could not be applied in payment of the agent's (Shuman's) personal indebtedness without inquiry of the principal.

The force of the Boasberg decision and the principal-agent analogy in this case is clear. It is undisputed that Dr. Weingart was informed that the president of the Bakers Union, and not Littman or Harlem Food Products, owned the bonds offered as collateral, but that the funds would be used for the benefit of Harlem Food Products.[7] Thus, both here and in Boasberg, the lender knew that a negotiable instrument belonging to another was being used for the personal benefit of a person temporarily possessing the negotiable instrument. In neither case is there the usual principal-agent relationship, but the concept is applicable. In Boasberg, the court held that inquiry should have been made of the principal. Here too, Dr. Weingart, who was sophisticated in business transactions, had a duty to inquire further at least as to Littman's authority to use the bonds. Concededly, the doctor made no further inquiry. The burden is on defendant-intervenor to prove that such inquiry would have been fruitless, and there is insufficient evidence, if any, that the inquiry would not have uncovered the fact that there

7. Cf. Uniform Commercial Code, § 8–304(1) (b), dealing with the effect of "an unambiguous statement" on a security in bearer form that "it is the property of a person other than the transferor."

was no authorization to use the bonds or that the bonds were stolen.[8]

Based upon all of the evidence in this case and my judgment of the credibility of the witnesses, I find that plaintiff has proved ownership of the bonds, and further find that Dr. Weingart is not a holder of the bonds in due course because he has not sustained his burden of proof that he accepted the bonds in good faith without notice of any defect in the title of the person negotiating the bonds.

Accordingly, judgment should be entered for plaintiff. Settle order on notice.

8. State Bank of Binghamton v. Bache, 162 Misc. 128, 293 N.Y.S. 667, 698 (1937).