■ CHRYSLER CORPORATION, Respondent, v FEDDERS CORPORATION, Appellant.—Order and judgment (one paper), Supreme Court, New York County, entered on December 15, 1978, affirmed for the reasons stated by Greenfield, J., at Special Term. Respondent shall recover of appellant $75 costs and disbursements of this appeal. Concur—Sullivan, Bloom, Lupiano and Ross, JJ.

Murphy, P. J., dissents in a memorandum, as follows: This action arises from an agreement, dated February 23, 1976, pursuant to which Chrysler sold certain assets of its Airtemp Division to Fedders. In consideration therefor, Fedders gave Chrysler "the aggregate of (i) $18,000,000 (the 'Cash Portion'); (ii) 1,500,000 shares of Preferred Stock of Fedders Series B, $1.00 par value, (the 'Preferred Stock'); (iii) a note (the 'Note') in the form initialled by the parties in the aggregate principal amount of $10,539,965; plus (iv) the assumption by Fedders of the Disclosed Liability of the Division" (§ 2.1). William G. McGagh, vice-president and treasurer of Chrysler, submitted a moving affidavit in support of Chrysler's motion for partial summary judgment of $3,900,000 for dividends due on the preferred stock. For the sake of argument, it will be conceded that, absent any meritorious defenses or counterclaims, that sum is due to Chrysler under controlling provisions of Fedders' certificate of incorporation and the Business Corporation Law. Ignatius J. MacBrinn, vice-president and controller of Fedders, submitted an affidavit in opposition to the motion. In the opening pages of his affidavit, MacBrinn stated the reasons why Fedders had not paid the subject dividends: "In fact, the purchase price of the net assets acquired by Fedders has never been finally determined as required by the Agreement. The final purchase price of the net assets acquired by Fedders—that is, all the consideration to be given to Chrysler under the Agreement—was to be calculated on the basis of a 'Final Balance Sheet and Income Statement' as provided in Article 2 of the Agreement. Sections 2.2 and 2.2.1 of the Agreement required Chrysler to deliver within sixty days from February 23, 1976 to Fedders and Arthur Young & Company (Fedders' independent public accountants) the 'Final Balance Sheet and Income Statement's prepared as at February 23, 1976 in accordance with generally accepted accounting principles and examined by Touche, Ross & Co. (Chrysler's accountants) in accordance with generally accepted auditing standards. Chrysler did not even pretend to comply with these requirements until mid-July 1976 when it delivered what purported to be the 'Final Balance Sheet and Income Statement'. But those documents were not prepared in accordance with generally accepted accounting principles, as required by the Agreement. In fact, Chrysler and Touche, Ross & Co. acknowledged this to me at meetings in August 1976. A copy of a memorandum of those meetings, which was prepared by one of Chrysler's representatives, is annexed as Exhibit 'L'. Attached to that memorandum is a draft of a letter from Touche, Ross to Mr. Roger Helder, Chrysler's Comptroller, conceding that the purported 'Final Balance Sheet' was not prepared in accordance with generally accepted accounting principles. Chrysler's own memorandum admits that I requested unqualified financial statements and 'was advised that unqualified statements would not be forthcoming'. The draft Touche, Ross letter to Mr. Helder expresses what is commonly known as a 'going concern qualification' to the use of generally accepted accounting principles. The Initial Balance Sheet, upon which the tentative purchase price provided for in the Agreement was based, was presented to Fedders at the closing of the acquisition on February 23, 1976. During the immediately preceding week Touche, Ross presented Fedders' representatives, including myself, with

various forms of proposed opinion letters to accompany the Initial Balance Sheet. Those forms originally contained the same sort of qualification reflected by Touche, Ross' draft letter to Mr. Helder. Fedders' representatives, including myself, flatly rejected those proposed opinions and insisted that Chrysler provide a 'clean' opinion of its accountants without any qualification as to generally accepted accounting principles. A few days later, we were assured that Touche, Ross' opinion accompanying the Initial Balance Sheet would not have any qualification as to generally accepted accounting principles. Notwithstanding Chrysler's failure to deliver the financial statements upon which the final purchase price of the net assets acquired by Fedders was required to be based, Fedders tried to work out its disagreements with Chrysler with respect to the valuations of specific assets and liabilities. As a result of extensive work in conjunction with Chrysler and in accordance with principles and procedures agreed upon by Chrysler, Fedders presented an eight-page written claim to Chrysler for a reduction of the purchase price of the net assets acquired by a minimum amount of $28,483,000. A copy of that claim is annexed as Exhibit 'M'.[1] Mr. Eugene Cafiero, the President of Chrysler, had agreed that Chrysler would dispute any statements in Fedders' claim with which it disagreed by providing Fedders with a detailed written statement of any such disagreements and the reasons for them on an item-by-item basis. Chrysler has refused to present the promised statement. This is not surprising in view of the fact that the claim presented by Fedders was in fact prepared in conjunction with Chrysler's accountants in a manner and in accordance with procedures and principles agreed upon by Chrysler. Chrysler and Fedders personnel worked closely for three to four months, beginning in the late summer of 1976. Indeed, procedures used in preparing certain parts of the claim were even developed by Chrysler, such as the computer program for the inventories, which was prepared on Chrysler's own computers using Chrysler's own programs developed by Chrysler's own computer programmers. Before Chrysler's accountants had even completed their analysis of Fedders' claims a meeting was held in December 1976 with Mr. John Riccardo (Chrysler's Chairman of the Board) and other representatives of Chrysler, in Mr. Riccardo's office. At that meeting, Mr. Peter Gagnier (Chrysler's Chief Accountant) began to review portions of Fedders' claims which Chrysler's accountants had analyzed. Mr. Gagnier admitted that Chrysler was liable to Fedders for approximately $5 million in connection with the comparatively small portion of Fedders' claims which he had begun to review at the meeting. At that point Mr. Gagnier was instructed by Mr. Riccardo to stop his discussion and not to complete the analysis of the claims submitted by Fedders. Negotiations between the parties then broke down. When the negotiations broke down, Fedders urged in order to get the discussions off dead center (even though the contractual predicates for the 'arbitration' procedure had not been complied with by Chrysler) that the disagreements be submitted to Arthur Andersen & Co. for an item-by-item determination in the manner specified in Section 2.2.3 of the Agreement, and Chrysler flatly refused to go along with this. There were a few later conversations between representatives of Chrysler and Fedders with regard to Fedders' claims against Chrysler. Unfortunately, the parties were unable to reach

1. "This is the document which was referred to in Mr. Ehrenbard's letter to Mr. Casey of October 20, 1977, attached to Mr. McGagh's affidavit as Exhibit 'O'. Although Mr. Ehrenbard's letter to Mr. Casey says that he is enclosing a copy, no copy is attached to the McGagh affidavit."

agreement. During those discussions, Chrysler offered to return to Fedders at least one-third of the Series B Preferred Stock, but Fedders rejected this offer because the amount involved was ridiculously small when compared to Fedders' claims. I mention these facts because they demonstrate, first, that Chrysler's assertions on this motion that it had attempted to work out its claims against Fedders and therefore delayed bringing this action cannot be taken seriously. The fact is that settlement discussions focused on Fedders' claims, not Chrysler's claims.[2] Furthermore, Fedders continually rejected as baseless all the demands made by Chrysler, so Chrysler cannot seriously contend that its delay was a commendable vindication of the interest of having disputes settled without resort to litigation. In addition, Chrysler's offer to return a portion of the Series B Preferred Stock demonstrates, contrary to Chrysler's contention on this motion with respect to Fedders' Eighth Affirmative Defense and Fourth Counterclaim, that the cancellation of that stock is both an appropriate remedy and a defense to Chrysler's claim for dividends on that stock. As I have noted, Fedders submitted to Chrysler a claim which was prepared in conjunction with Chrysler's accountants, for deficiencies in the net assets sold to Fedders in the amount of $28,483,000 (Exhibit 'M').[3] After that claim was submitted, and as a result of the fact that Fedders did not receive the asset values that Chrysler represented, warranted and promised, Fedders was required to close down certain of the Airtemp plants. At the Airtemp plant in Winnsboro, South Carolina, Fedders discovered shortages in inventory and fixed assets amounting to $1,715,000, which had not been discovered at the time the $28,483,000 claim was presented to Chrysler. This amount accounts for the difference between the $28,483,000 figure in Fedders' claim to Chrysler and the $30,198,000 claimed as part of the damages sought by Fedders in its counterclaims." MacBrinn continued with a discussion of Fedders' more remote counterclaims for damages totaling $63,797,200. However, for purposes of this motion, it is unnecessary to explore those counterclaims. In his reply affidavit, McGagh did not deny that: (a) a final balance sheet and income statement was never submitted to Fedders; (b) the Airtemp assets were overstated and its liabilities understated in a total amount of $30,198,000; (c) Gagnier, Chrysler's chief accountant, admitted in the presence of Riccardo, Chrysler's chairman, that Chrysler did owe Fedders about $5,000,000 (parenthetically, it should be observed that no affidavits are submitted from Gagnier or Riccardo denying this fact); and (d) Chrysler offered to return one third of the preferred shares in settlement of this dispute. As will be developed more fully below, Chrysler's silence on these critical matters precludes any award of summary judgment in its favor. A motion for summary judgment is not directed to the pleadings; it is primarily concerned with whether a triable issue of fact exists in a case. (*Recckio v Recckio,* 273 App Div 1057.) Thus if a defendant demonstrates that a factual issue exists, it is unnecessary for a court to address the sufficiency or consistency of each defense or counterclaim pleaded in an answer (*O'Brien v Empire Discount Corp.,* 20 AD2d 677, 678). With these rules in mind, the

**2.** "To further demonstrate this, I attach as Exhibit 'T' copies of a few of the many letters from Fedders to Chrysler."

**3.** "Arthur Young & Company has issued a report to Fedders stating conservatively that the Airtemp balance sheet presented by Chrysler ovestated (*sic*) net assets by $18,666,000 and was not prepared in accordance with generally accepted accounting principles. A copy of this report was produced to Chrysler before it made its summary judgment motion; but Chrysler nowhere alludes to it."

merits of the instant motion will be explored. Section 504 of the Business Corporation Law provides in relevant part: "Consideration and payment for shares (a) Consideration for the issue of shares shall consist of money or other property, tangible or intangible, or labor or services actually received by or performed for the corporation or for its benefit or in its formation or reorganization, or a combination thereof. In the absence of fraud in the transaction, the judgment of the board or shareholders, as the case may be, as to the value of the consideration received for shares shall be conclusive * * * (c) Shares with par value may be issued for such consideration, not less than the par value thereof, as is fixed from time to time by the board * * * (h) Certificates for shares may not be issued until the full amount of the consideration therefor has been paid, except as provided in paragraphs (e) and (f) of section 505 (Rights and options to purchase shares; issue of rights and options to directors, officers and employees). (i) When the consideration for shares has been paid in full, the subscriber shall be entitled to all the rights and privileges of a holder of such shares and to a certificate representing his shares, and such shares shall be fully paid and nonassessable." In commenting upon this statute, a leading treatise states that the consideration to be received by a corporation for the issue of its shares, with or without par value, may consist of either money, property, labor or services, or a combination thereof. The property may be tangible or intangible, but it must actually be received by the corporation before shares can be issued in consideration therefor. (2 White, New York Corporations [13th ed], par 504.03, pp 5-90—5-94.) Certificates for shares may not be issued until the full amount of the consideration therefor has been paid. When the consideration for shares has been paid in full, the subscriber is entitled to all the rights and privileges of a shareholder and to a certificate representing his shares, and such shares are fully paid and unassessable (2 White, New York Corporations, par 504.04, pp 5-105—5-107). Stock issued without the required consideration is not regarded as void, but voidable. (11 NY Jur, Corporations, § 218; cf. *Frankowski v Palermo,* 47 AD2d 579.) A corporation may, if so advised, bring an action to cancel stock that has been issued without the requisite consideration *(American Macaroni Corp. v Saumer,* 174 NYS 183; see *Lewis v Dansker,* 68 FRD 184, 192). Subdivision (a) of section 628 of the Business Corporation Law also has bearing upon this proceeding; it provides as follows: "Liability of subscribers and shareholders (a) A holder of or subscriber for shares of a corporation shall be under no obligation to the corporation for payment for such shares other than the obligation to pay the unpaid portion of his subscription which in no event shall be less than the amount of the consideration for which such shares could be issued lawfully." This statute puts into statutory form the common-law recognition of the fact that liability for unpaid subscriptions is *contractual* and, therefore, should run in favor of the corporation. (3 White, New York Corporations [13th ed], par 628.03, p 6-715.) Hence, a corporation may choose to recover the unpaid portion of the subscription rather than to cancel the entire subscription. In the fifth affirmative defense and second counterclaim, Fedders alleged that Chrysler breached warranties made in sections 2.2, 3.5 and 3.19 by overvaluing the Airtemp assets and undervaluing its liabilities in the amount of $30,198,000. In essence, Fedders was asserting that the consideration given for the preferred stock was insufficient. As was mentioned above, William G. McGagh, the vice-preseident and treasurer of Chrysler, totally failed to deny any of Fedders' allegations with regard to the purported failure of consideration. If the Airtemp assets are proven to be overvalued and the liabilities undervalued, then Fedders is

entitled to damages for breach of the afore-mentioned warranties. Co-ordinately, Fedders could also recover under subdivision (a) of section 628 of the Business Corporation Law for the unpaid portion of the subscription price shown to be due. It is well established that summary judgment should be withheld where a plaintiff asserting a small claim is confronted with a much larger counterclaim intimately related to the facts of plaintiff's claim. *(Wolosoff v Wolosoff,* 54 AD2d 651.) It is difficult to imagine a more intimately related counterclaim than the second counterclaim. Chrysler seeks dividends of $3,900,000 upon the preferred shares. Fedders, however, has made a prima facie showing that is had not received the consideration for those preferred shares which it has carried on its books at a value of $18,750,000. Until Chrysler demonstrates that it has properly valued the Airtemp assets in accordance with generally accepted accounting principles and has otherwise shown that it has paid for the preferred shares in full, it is not entitled to any of the rights and privileges of a holder, including the right and privilege to collect dividends (Business Corporation Law, § 504, subd [i]). Since the amount sought in the counterclaim ($30,198,000) exceeds the amount sought in the action in chief ( 3,900,000), partial summary judgment should not be awarded to Chrysler. In passing, three other points should be made. First, under subdivision (a) of section 2.2.6 of the agreement, the parties undoubtedly contemplated that any adjustments to the final purchase price could be made by adjusting the note. However, adjustments to the note become impossible if and when the amount awarded on the counterclaims exceeds the face amount of the note ($10,539,965). Therefore, depending upon the factual findings made at trial, it may become necessary to make adjustments to other items given by Chrysler as consideration for the preferred shares. It is inadvisable to speculate at this time whether some or all of the preferred shares could or should be canceled if Fedders should prevail on the full amount of its counterclaims. Likewise, it is imprudent to conjecture whether full or partial rescission could or should be effected at this juncture. The trial court should be given free rein to fashion such relief as is appropriate after trial. If the relief fashioned is inequitable, unjust or unwarranted, recourse may then be sought upon appeal. Secondly, Fedders' warranty in section 4.2 that the preferred stock was fully paid and unassessable does not prevent it from showing a failure of consideration. That warranty was premised upon the initial balance sheet, presented by Chrysler, that indicated Fedders was receiving fair and full consideration for its preferred stock. If Fedders can show that the initial balance sheet was substantially inaccurate, it should not be bound by the warranty in section 4.2. Thirdly, no evidentiary significance can be drawn from the fact that Fedders carried the preferred stock on its books at a figure of $18,750,000. There is an indication in the record that this figure was carried on the books subject to adjustment because of the pendency of the instant dispute. In any event, if Chrysler breached the warranties with regard to the true value of the Airtemp Division, it cannot be permitted to profit from the fact that Fedders was misled to its detriment. In its seventh affirmative defense and third counterclaim, Fedders pleaded an action based upon common-law fraud. As a general rule, where there is a sale with warranty and the warranty is made with knowledge of its falsity, the buyer may sue either on the warranty or on the fraud. (24 NY Jur, Fraud and Deceit, § 6, p 39.) In the course of his affidavit, Fedders' MacBrinn stated: "The fact that Chrysler so grossly defrauded Fedders by misrepresenting the value of the net assets by more than $30 million should not be countenanced by this Court as a shield to enable Chrysler to obtain the benefits of

the Series B Preferred Stock which it tricked out of Fedders". As had been alluded to previously, Chrysler has not challenged Fedders' contention that the Airtemp assets were overvalued and its liabilities undervalued. Where property is exorbitantly overvalued, it raises a presumption that the valuation was not made in good faith and was made for a fraudulent purpose. This presumption is conclusive unless it is rebutted by evidence which fully explains the apparent bad faith. *(Boynton v Andrews,* 63 NY 93, 96.) At the very least, Chrysler's inexplicable silence on the critical aspect of valuation raises a triable issue as to whether it fraudulently induced Fedders to enter into the subject agreement. Based upon Chrysler's purported fraud, Fedders may properly seek monetary damages for the inadequate consideration received for its preferred stock (cf. *Goldsmith v National Container Corp.,* 287 NY 438). It should be stressed that, despite the presence of a merger clause in section 16.4 of the agreement, fraud in the inducement is not merged therein so as to preclude an action for fraud (24 NY Jur, Fraud and Deceit, § 235, p 316). Because triable issues of fact exist with regard to failure of consideration and fraud in the inducement, the order of the Supreme Court, New York County, entered December 15, 1978, which, *inter alia,* granted Chrysler's motion for partial summary judgment directing Fedders to pay $3,900,000 in accumulated dividends on preferred stock, Series B, should be reversed, on the law, and the motion should be denied in its entirety.