Kathleen CARR, Plaintiff–Appellant,

v.

MARIETTA CORPORATION,
Defendant–Appellee.

Docket No. 98–7961

United States Court of Appeals,
Second Circuit.

Argued: March 26, 1999

Decided: May 5, 2000

Robert E. Greenberg, Friedlander, Misler, Friedlander, Sloan & Herz, Washington DC (Thomas Buckel, Jr. and Eric

Nordby, Hancock & Estabrook, LLP, Syracuse, New York, of counsel), for Plaintiff–Appellant.

Thomas E. Myers, Bond, Schoenenck & King, LLP, Syracuse, N.Y. (Henry Morris, of counsel), for Defendant–Appellee.

Before: FEINBERG, PARKER, and POOLER, Circuit Judges.

PARKER, Circuit Judge:

Plaintiff–Appellant Kathleen Carr appeals from a judgment of the United States District Court for the Northern District of New York (Frederick J. Scullin, Jr., Judge) entered June 12, 1998, denying Carr's motion for summary judgment and granting Defendant–Appellee Marietta Corporation's ("Marietta") cross-motion for summary judgment. Carr seeks to enforce her rights as the purported owner of 10,000 shares of stock in Marietta. She alleges that Marietta wrongfully refused to purchase the stock from her pursuant to a tender offer (the "Tender Offer") in conjunction with Marietta's privatization plan. Marietta responds that Carr's alleged right to sell the stock to Marietta is unenforceable because the party to whom it was originally issued never paid for it. For the reasons set forth below, we affirm.

## I. FACTUAL BACKGROUND

Marietta is a New York corporation specializing in the manufacture and marketing of products for the hotel and guest service industries. Marietta's stock was publicly traded on the NASDAQ Stock Exchange from 1986 until March 1996. In 1996, Marietta's stock was delisted pursuant to a privatization plan (the "Plan of Merger"), which included a tender offer by the company to repurchase all publically held shares.

Thomas Walsh, Carr's brother and the party to whom the disputed shares were first issued, served on Marietta's board of directors from 1980 until 1996. In 1989, Marietta offered Walsh, along with other directors on the board, certain "bonus" Marietta stock, certain options to purchase Marietta stock, and the right to purchase additional Marietta stock in exchange for a small cash downpayment and a promissory note payable to Marietta. Pursuant to this offer, Walsh purchased 10,000 shares of stock (the "Walsh Shares") in exchange for an initial $1,000 cash payment and a promissory note for $121,500 (the "1989 Note"). The Walsh Shares are unregistered,[1] restricted Marietta shares, which are represented by a single share certificate dated July 9, 1989. The restriction on the share certificate states:

> THE SHARES REPRESENTED HEREBY (I) ARE SUBJECT TO THE PROVISIONS OF A CERTAIN STOCK PURCHASE AGREEMENT, DATED AS OF FEBRUARY 9, 1989, BETWEEN THE HOLDER HEREOF AND MARIETTA CORPORATION … WHICH AGREEMENT PERMITS, INTER ALIA, THE COMPANY TO REACQUIRE THE SHARES UNDER CERTAIN CIRCUMSTANCES AND (II) HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER, AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR AN EXEMPTION THEREFROM.

Paragraph 4 of the Stock Purchase Agreement provides that 20% of the Walsh Shares would vest annually on each anniversary of the Stock Purchase Agreement. It further states that:

---

1. Unregistered securities are securities that were not issued or transferred pursuant to a registration statement filed with the Securities and Exchange Commission. 15 U.S.C.

§ 77e. Unregistered securities can only legally be transferred pursuant to an exception to the registration requirement. *Id.*

all Shares are vested in the Director if he has not resigned from the Board or given notice to the company of his refusal to stand for re-election of the Board of the Company on or prior to the fifth anniversary of the date hereof. All Shares which shall have vested shall be free and clear of the restrictions of this Agreement. . . .

In the event that the Director shall sell any of the Shares, the portion of the principal amount of the Note, together with accrued interest, corresponding to the number of the Shares sold shall, to the extent not previously paid, immediately be due and payable and no transfer in the stock ledger of the company will be made until such payment is received.

Seven months after Walsh obtained the Walsh Shares, he pledged them to Sequoia National Bank in Maryland pursuant to a Security Agreement dated September 14, 1989 (the "Sequoia Security Agreement").[2] Plaintiff concedes that Sequoia had notice of the two restrictions on alienation that appear on the share certificate legend, but nonetheless contends that Sequoia was a bona fide purchaser ("BFP") of the Walsh Shares.

Neither Walsh nor any other party has ever paid Marietta the $121,500 due under the 1989 Note. According to Carr, Walsh nonetheless became 100% vested in the Walsh Shares in accordance with Paragraph 4 of the Stock Purchase Agreement in February 1994, even though he had not made any principal payments on the 1989 Note.[3] Instead of requiring payment on the Note, the Board of Directors decided to extend the repayment date on the 1989 Note by canceling it and issuing a new one. On February 9, 1994, Walsh executed a new non-negotiable promissory note to Marietta in the amount of $121,500 (the "1994 Note"), which replaced the 1989 Note.

On April 1, 1994, Walsh borrowed $108,470.06 from Sequoia Bank and executed a promissory note (the "Sequoia Promissory Note"), which contained a security/pledge agreement stating "[t]his Note is secured by 10,000 shares of Marietta Corporation common stock." According to the terms of the Sequoia Promissory Note, Walsh was responsible for repaying the loan, with interest, by August 1, 1994.

In 1995, Marietta entered discussions with a Barry W. Florescue that led to a merger and the privatization of Marietta. Under the Plan of Merger that was eventually approved by proxy, Marietta was to purchase all of its 3,319,788 shares of outstanding stock at the offered price of $10.25 per share. The proxy solicitation that explained the Plan of Merger stated that, "[f]rom and after the Effective Time, the shares held by former shareholders of Marietta [would] represent the right to receive $10.25 per Share in cash but [would] not represent any equity interest in the Surviving Corporation."

At the time the Plan of Merger was being formulated, the officers of Marietta were aware that Walsh still owed Marietta $121,500, and they appear to have made some effort to collect payment from him. According to Marietta, Walsh repeatedly

---

**2.** There is a factual question as to exactly when Walsh first delivered the share certificate to Sequoia. Carr argues that Walsh initially pledged the shares in September of 1989, but that at the very latest, Sequoia had the share certificate and notice of the restrictions in the Stock Purchase Agreement and the 1989 Note by April 1, 1994, when Walsh used the shares as collateral for a loan. The district court did not specifically address the circumstances surrounding the 1989 pledge, and we are unable to determine from the record why Walsh pledged these shares in 1989. Thus, we cannot determine whether Walsh's 1989 pledge included physical delivery of the share certificate and the Stock Purchase Agreement to Sequoia.

**3.** Curiously, the 1989 Note requires payment in five yearly installments on February 9th of each year following the agreement, but Walsh's rights to the corresponding one-fifth of the shares appears to vest under the Stock Purchase Agreement regardless of whether he makes the required payment.

represented to Marietta's directors that he would deliver his share certificate to Marietta in partial payment of the 1994 Note. Walsh further represented that he would pay the balance of his stock debt to Marietta prior to the merger closing. Walsh apparently neglected to mention that he was no longer in possession of the certificate, having surrendered it to Sequoia in either 1989 or 1994. *See supra,* note 2.

In reliance on these representations, Marietta once again extended Walsh's time to pay his stock debt. Walsh's 1994 Note was replaced by a third note dated February 9, 1996 (the "1996 Note"), which had a maturity date of March 15, 1996. The Plan of Merger specifically stated that it had accelerated payment of the 1996 Note.

The merger closed on March 8, 1996, and since March 11, 1996, no share of Marietta has been publicly traded. The privatization of Marietta essentially renders the Walsh Shares worthless unless Marietta purchases them from their current owner under the Plan of Merger.

According to Carr, sometime in early 1996 Sequoia sought to redeem the Walsh Shares because Walsh was unable to repay the Sequoia Promissory Note. With Walsh's cooperation, Sequoia attempted to tender the shares to Marietta. Because Walsh was not actually in possession of the share certificate, having presented it to Sequoia in 1989 or 1994, he had his attorney attempt to tender the Walsh Shares certificate and irrevocable stock power "on behalf of Sequoia." Marietta refused Sequoia's tender, and Marietta has since maintained that it owes no payment to Sequoia (or to Carr) because the value of the Walsh Shares was to be offset against the sum due on the 1996 Note.

In the meantime, Sequoia attempted to collect on the $108,000 that Walsh owed Sequoia by virtue of the Sequoia Promissory Note. At a date unspecified in the record, Sequoia secured a consent judgment against Walsh in the Circuit Court of Montgomery County, Maryland, for the sum of $132,633.62, plus post-judgment interest. Sequoia also secured a consent judgment for the same amount in the Combined Court of Routt County, Colorado.

By this point, it had become obvious to all parties involved that Walsh was virtually insolvent. Marietta reports that:

> in the early summer of 1996, Sequoia continued collection efforts against Walsh [to collect on the $108,000 loan]. Carr again intervened "on her brother's behalf," contacted the President of Sequoia Paul McNamara ... and initiated a transaction with Sequoia to "stop" Sequoia and its "henchmen" from "hounding" her brother Walsh with legal action to enforce Sequoia's Judgments against Walsh.

Appellant's Br. at 7–8 (citations omitted).

On August 5, 1996, Carr purchased all of Sequoia's rights against Walsh, including the Sequoia Promissory Note (face amount $108,407.06), the Security Agreement, the Walsh Shares, and the judgments Sequoia had obtained against Walsh for $132,633.62 in both the Circuit Court of Montgomery County, Maryland and the Combined Court of Routt County, Colorado. As a Senior Vice President at Washington Area Banks, Carr had more than sixteen years experience in commercial lending, investment management, trusts and loans. Carr was also well aware that Marietta had refused Sequoia's tender of the shares, but she nonetheless paid Sequoia $27,500.000 "and other good and valuable consideration" to become the assignee of all of Sequoia's rights against Walsh. The agreement between Carr and Sequoia stated that:

> This sale is made on an *"AS IS," "WHERE IS" BASIS, "WITH ALL FAULTS" AND WITHOUT REPRESENTATIONS, EXPRESS OR IMPLIED, OF ANY TYPE, KIND, CHARACTER OR NATURE, AND WITHOUT WARRANTIES, EXPRESS OR IMPLIED, OF ANY TYPE, KIND, CHARACTER OR NATURE AND*

*WITHOUT RECOURSE, EXPRESS OR IMPLIED, OF ANY TYPE, KIND, CHARACTER OR NATURE ...*

In the agreement, Sequoia also disclaimed "any express or implied warranty of 'Merchantibility'" and "any express or implied warranty of 'Fitness For a Particular Purpose'" with respect to the collateral mentioned in the agreement.

In the meantime, Marietta filed a complaint against Walsh in the New York Supreme Court to enforce its rights under the 1996 Note. On April 29, 1997, the Supreme Court for Cortland County, New York, granted Marietta's motion for summary judgment and entered final judgment in the amount of $149,258.31 against Walsh.

Carr now maintains that Marietta was and is legally obligated to repurchase the Walsh Shares from Carr at a price of $10.25 per share pursuant to the Plan of Merger, on the ground that Carr is the assignee of Sequoia's rights to the Walsh Shares. On February 28, 1997, Carr filed a complaint in this action in the United States District Court for the Northern District of New York, seeking a declaration that she is the legal owner of the Walsh Shares and $102,500 in damages against Marietta. The complaint alleges that Carr is a BFP of the Walsh Shares and bases her claim against Marietta on three theories: (1) violation of "the securities laws of the United States"; (2) breach of contract; and (3) breach of fiduciary duty. In its response, Marietta denies Carr's allegation that she is a BFP and alleges five affirmative defenses.

On January 9, 1998, after considerable discovery, Carr moved for partial summary judgment on Counts I and II, which concerned her declaratory judgment claim, based on securities laws violations stemming from Marietta's refusal to acknowledge her as the owner of the Walsh Shares, and her breach of contract claim for Marietta's refusal to repurchase the shares under the Tender Offer. Marietta filed a cross-motion for summary judgment. Judge Scullin conducted a hearing in March 1998 and announced his decision in court on June 10, 1998, in which he granted Marietta's cross-motion and dismissed Carr's complaint.

In applying Article 8 of the New York Uniform Commercial Code ("UCC"), the district court found that Sequoia was not a BFP of the Walsh Shares largely because Sequoia had notice of the restrictions on the shares. The court noted that Sequoia had notice as early as 1989 of the restrictions on alienation, which were listed on the share certificate legend. Furthermore, while it was true that all of the Walsh Shares had vested by April 1, 1994, Sequoia also possessed a copy of the Stock Purchase Agreement. Therefore, Sequoia had notice of the two restrictions in the Stock Purchase Agreement, and "[s]pecifically, Sequoia had notice that of the $122,500 owed to Marietta for the shares, Walsh had only paid $1,000." The court also stated that "while it is clear that complete ownership vested in Walsh on February 9, 1994 pursuant to Section 4 of the Stock Purchase Agreement, it is equally clear that the same section gives rise to an 'adverse claim' unless and until Marietta received full payment for the shares." The court additionally found that the transfer from Sequoia to Carr violated the Securities Act of 1933, since Walsh had not paid for the shares in full prior to transferring the shares to Sequoia.

Applying former N.Y. UCC § 8–301,[4] the district court reasoned that "Sequoia

---

4. N.Y. UCC § 8–301. Rights acquired by purchaser.

(1) Upon transfer of a security to a purchaser ... the purchaser acquires the rights in the security which his transferor had or had actual authority to convey unless the purchaser's rights are limited by subsection (4) of Section 8–302.

(2) A transferee of a limited interest acquires rights only to the extent of the interest transferred. The creation or release of a security interest in a security is the transfer of a limited interest in that security.

acquired only those rights its transferor, Walsh, had in the shares. As transferee of Sequoia, Plaintiff Carr acquired only those rights Sequoia received from Walsh. Therefore, Plaintiff Carr stands in the shoes of her brother, Thomas Walsh." Although Walsh was entitled to receive $10.25 per share for the Walsh Shares, as the shareholder of record, he still owed Marietta $121,500 as consideration for the shares. "A shareholder of shares is liable to the corporation for the amount of consideration which has not been paid," and because this liability was passed to Walsh's transferee, the court concluded, Sequoia was not a BFP of the shares and neither was Carr. In reaching this conclusion, the district court found it especially significant that much of the $27,500 Carr paid to Sequoia came from her brother, Walsh, and thus Carr's right in the Walsh Shares should be subject to the same offset as her brother's.

## II.  DISCUSSION

On appeal, Carr raises various arguments regarding the district court's application of New York UCC law and federal securities law. We need not address these arguments, as the district court's ruling with regard to New York Business Corporations Law Section 628 ultimately governs the resolution of this case. For the reasons below, we affirm the district court's decision granting Marietta's summary judgment motion on this basis.

In granting Marietta's summary judgment motion, the district court held that N.Y. Bus. Corp. Law § 628(a), when read in connection with Section 628(b), establishes that a person who obtains stock with notice that full consideration has not been paid by the original purchaser is liable to the corporation for the unpaid portion of

the purchase price. The district court concluded that Carr did not purchase the Walsh Shares from Sequoia in good faith,[5] and she therefore remained liable to Marietta for the unpaid consideration for the Walsh Shares. The district court further ruled that any payment Carr might be entitled to under the Tender Offer is subject to offset for the remaining amount due on the 1996 Note.

On appeal, Carr raises three arguments regarding the district court's application of Section 628. First, Carr argues that the district court erred in applying Section 628 in this case because Walsh's execution of the 1989 Note constituted full consideration for the Walsh Shares, making the statute inapplicable by its terms. Second, Carr maintains that even if Section 628 applies in this case, the statute does not create any liability encumbering the Walsh Shares. Third, Carr challenges the district court's interpretation and application of the "good faith" element set out in Section 628(b). For the reasons discussed below, we reject each of these arguments.

### A.  *The Applicability of Section 628*

Carr maintains that the district court erred in applying Section 628 in this case because the statute is inapplicable by its terms. Section 628 of the New York Business Corporation Law provides:

§ 628.  Liability of subscribers and shareholders

(a) A holder of or subscriber for shares of a corporation shall be under no obligation to the corporation for payment for such shares other than the obligation to pay the unpaid portion of his subscription which in no event shall be less than the amount of the consideration for

---

N.Y. UCC § 8–301, *repealed by* L.1997, c.566, § 5. *See* N.Y. UCC § 8–301 Historical and Statutory Notes (McKinney 1990 & Supp. 1999).

**5.** The district court specifically noted that Carr "admitted that she purchased the bundle

of rights that Sequoia had against Walsh on her brother's behalf and for his benefit." The district court also observed that evidence suggested that some of the $27,500 Carr paid to Sequoia was from Walsh.

which such shares could be issued lawfully.

(b) Any person becoming an assignee or transferee of shares or of a subscription for shares in good faith and without knowledge or notice that the full consideration therefor has not been paid shall not be personally liable for any unpaid portion of such consideration, but the transferor shall remain liable therefor.

(c) No person holding shares in any corporation as collateral security shall be personally liable as a shareholder but the person pledging such shares shall be considered the holder thereof and shall be so liable. No executor, administrator, guardian, trustee or other fiduciary shall be personally liable as a shareholder, but the estate and funds in the hands of such executor, administrator, guardian, trustee or other fiduciary shall be liable.

N.Y. Bus. Corp. Law § 628. Carr contends that by executing a valid promissory note, the 1989 Note, Walsh provided full consideration for the shares. Hence, Carr argues, Section 628's provisions do not apply in this case.

Carr cites N.Y. Bus. Corp. Law § 504 in support of her contention that the 1989 Note constituted full consideration for the Walsh Shares.[6] In her opening brief, Carr recognizes that the legislature has amended Section 504 following the relevant events in this action, but maintains that "the changes are not relevant to this appeal." Marietta responds that N.Y. Bus.

Corp. Law § 504(b),[7] which was in effect at the time of the creation of the Share Purchase Agreement and 1989 Note, governs in this case and specifically precludes Carr's reliance on Section 504(a). In her reply brief, Carr urges that "[t]his Court should simply apply existing New York law which makes it clear that an unsecured promissory note is full and adequate consideration for stock certificates."

■■■ We conclude that the former Section 504(b) governs in this action and therefore that "obligations for future payment" do not "constitute payment or part payment for shares of a corporation." Carr's argument that we should apply Section 504 as it exists today, without provision (b), runs counter to well-settled New York law regarding the presumption against retroactive application of statutory changes. *See Murphy v. Board of Educ.*, 104 A.D.2d 796, 797, 480 N.Y.S.2d 138, 139 (2d Dep't 1984) ("As a general rule statutes are to be construed as prospective only in the absence of an unequivocal expression of a legislative intent to the contrary, and where a statute directs that it is to take effect immediately, it does not have any retroactive application or effect.") (citing McKinney's Consol. Laws of N.Y., Book 1, Statutes, § 51, subd. b); *see also Dorfman v. Leidner*, 76 N.Y.2d 956, 959, 565 N.E.2d 472, 474, 563 N.Y.S.2d 723, 724 (1990) (Mem.) ("Statutes are applied prospectively in the absence of express or necessarily implied language allowing retroactive effect."). Carr makes no argument that the legislature intended the re-

---

**6.** N.Y. Bus. Corp. Law § 504(a) provides:

Consideration for the issue of shares shall consist of money or other property, tangible or intangible; labor or services actually received by or performed for the corporation or for its benefit or in its formation or reorganization; a binding obligation to pay the purchase price or the subscription price in case or other property; a binding obligation to perform services having an agreed value; or a combination thereof. In the absence of fraud in the transaction, the judgment of the board or shareholders, as the case may be, as to the value of the

consideration received for the shares shall be conclusive.

N.Y. Bus. Corp. Law § 504(a).

**7.** Section 504(b), which was modified in 1997 and repealed in its entirety in 1998, provided that "[n]either obligations of the subscriber for future payments nor future services shall constitute payment or part payment for shares of a corporation." N.Y. Bus. Corp. Law § 504(b), *amended by* L.1997, c.449, § 9 (deleting provision regarding future payments), *repealed by* L.1998, c.17, § 1. *See* N.Y. Bus. Corp. § 504 Historical and Statutory Notes (McKinney 1986 & Supp.1999).

peal or amendment of Section 504(b) to have retroactive effect, and in light of the amendment's expressly stated effective date of February 22, 1998, see N.Y. Bus. Corp. § 504 Historical and Statutory Notes (McKinney 1986 & Supp.1999), we cannot conclude otherwise. See Dorfman, 76 N.Y.2d at 959, 565 N.E.2d at 474, 563 N.Y.S.2d at 724 (stating that statute should not be given retroactive application when effective date indicates otherwise). Thus, we hold that Section 504(b) governed at the time the Share Purchase Agreement and the 1989 Note were signed, and therefore the 1989 Note did not constitute full consideration for the Walsh Shares for purposes of Section 628.

B. *Shareholder Liability under Section 628*

Carr is also incorrect insofar as she maintains that Section 628 does not create liability. Section 628(a) states that a shareholder remains liable to the corporation for the unpaid portion of the stock price, and at least one New York court has recognized that this provision does indeed create liability. See Chrysler Corp. v. Fedders Corp., 73 A.D.2d 504, 507, 422 N.Y.S.2d 876, 880 (1st Dep't 1979) ("Coordinately, [defendant corporation] could also recover [on its counterclaim] under BCL § 628(a) for the unpaid portion of the subscription price shown to be due [to it]."). Thus, if Carr currently owns Marietta shares, she remains liable under Section 628(a) to the corporation for the unpaid portion of the subscription price. In order to escape this liability, Carr bears the burden of demonstrating that she satisfies the requirements of Section 628(b) by virtue of having taken the Walsh Shares in good faith and without notice or knowledge that the shares were not fully paid for.

To the extent that Carr argues that Section 628 does not create any affirmative liability, but instead merely cabins the liability of a shareholder for corporate debts, we reject this argument as well. Our understanding of Section 628 is illuminated by an examination of the common law as it existed before the enactment of Section 628. At common law, a person who acquired stock for which the issuing corporation had not been fully paid was liable to the corporation for the original purchaser's deficiency. See Pullman v. Upton, 96 U.S. 328, 330–31, 24 L.Ed. 818 (1877) (Mem.) (holder of stock, who possesses stock as collateral security, is liable to corporation for unpaid portion of share price); Webster v. Upton, 91 U.S. 65, 70, 23 L.Ed. 384 (1875) (Mem.) ("We think, therefore, the transferee of stock in an incorporated company is liable for calls made after he has been accepted by the company as a stockholder, and his name has been registered on the stock books as a corporator; and, being thus liable, there is an implied promise that he will pay calls made while he continues the owner."). The common law imposed upon the shareholder an implied promise to satisfy any unpaid portion of the stock purchase price upon the corporation's demand. See Sigua Iron Co. v. Brown, 171 N.Y. 488, 502–04, 64 N.E. 194, 198–99 (1902) (shareholder responsible for unpaid portion of share price because of "implied promise" inherent in becoming shareholder). Additionally, at common law, a transferee of unpaid shares became liable to the corporation for the unpaid portion of the subscription price, even if the transferee was not aware that the corporation was still owed money for the shares. Early v. Richardson, 280 U.S. 496, 499, 50 S.Ct. 176, 74 L.Ed. 575 (1930); Harr v. Wright, 164 Misc. 395, 397, 298 N.Y.S. 270, 272 (N.Y.Sup.Ct.1936), aff'd, 250 App. Div. 830, 296 N.Y.S. 463 (4th Dep't 1937); Dayton v. Borst, 31 N.Y. 435 (1865).

By enacting Section 628, the New York legislature limited the common law liability of a shareholder to the corporation and the corporation's creditors to the total value of the shareholder's committed investment. See N.Y. Bus. Corp. Law § 628 Legislative Studies and Reports (McKinney 1986). In Section 628, the legislature included pro-

tections for individuals who received securities from other individuals either as pledgees or as transferees without knowledge that money was still owed the corporation for the shares. *See* N.Y. Bus. Corp. Law § 628(b) (providing protections for innocent transferees of shares for which money is still due the corporation). In order to protect creditors who acquired shares as collateral security, the New York legislature enacted Section 628(c). Thus, in light of the plain reading of Section 628, its legislative history, and the common law, which all suggest that Section 628 creates liability, Carr cannot escape liability under the statute unless she can bring herself within the protections of Section 628(b) or (c). Because Carr does not currently hold the Walsh Shares as collateral security and is not a pledgee, Section 628(c) does not relieve her of liability. Carr makes no argument that Section 628(c) does apply, and she therefore must satisfy the provisions of Section 628(b) to escape liability.

C. *The Good Faith Requirement of Section 628(b)*

Turning to Carr's arguments concerning the "good faith" element found in Section 628(b), our analysis of the statute convinces us that in order to secure its protection from liability to the corporation for the unpaid portion of the share price, a shareholder must establish that she acted: (1) in good faith; and (2) "without knowledge or notice that the full consideration ... has not been paid." N.Y. Bus. Corp. Law § 628(b). Because the statute speaks of the requirements in the conjunctive, Carr must satisfy both requirements.

■ New York courts have not construed the "good faith" requirement of Section 628(b), and we therefore look for guidance in how New York courts have interpreted the good faith requirement under Article 8 of the UCC, which governs transfers of securities. Under New York law, a party does not act in good faith if she acts with knowledge and disregard of suspicious circumstances. *See Savings Banks Trust Co. v. Federal Reserve Bank of N.Y.*, 738 F.2d 573, 574 (2d Cir.1984) (per curiam) (holding that good faith does not exist if party has "knowledge and disregard of suspicious circumstances"); *In re Legel Braswell Gov't Secur. Corp.*, 695 F.2d 506, 512 (11th Cir.1983) (construing New York law and holding that "disregard for suspicious circumstances, of which [defendant] had actual knowledge, constituted a taking [of the disputed securities] in bad faith"); *Gutekunst v. Continental Ins. Co.*, 486 F.2d 194, 194–96 (2d Cir.1973) (per curiam) ("New York law is that only actual knowledge or disregard of suspicious circumstances may constitute evidence of bad faith."); *Otten v. Marasco*, 235 F.Supp. 794 (S.D.N.Y.1964), *aff'd*, 353 F.2d 563 (2d Cir.1965); *Scarsdale Nat. Bank and Trust Co. v. Toronto Dominion Bank*, 533 F.Supp. 378, 387 (S.D.N.Y.1982) (party that acts with "willful ignorance" of adverse claim cannot be said to act in good faith); *Fallon v. Wall St. Clearing Co.*, 182 A.D.2d 245, 250, 586 N.Y.S.2d 953, 956 (1st Dep't 1992) (transferee of security "is under obligation to investigate suspicious circumstances which might suggest the existence of an adverse claim"); *Manufacturers & Traders Trust Co. v. Sapowitch*, 296 N.Y. 226, 230, 72 N.E.2d 166, 169 (1947) (purchaser of securities is not protected from liability from adverse claim if "it clearly appear[s] that the inquiry suggested by the facts disclosed at the time of the purchase would if fairly pursued result in the discovery of the defect existing but hidden at the time") (citing *Birdsall v. Russell*, 29 N.Y. 220, 250 (1864)). Thus, we must consider whether, given the circumstances surrounding the issuance and transfer of the Walsh Shares, Carr was aware of facts such that her failure to inquire as to the legal status of the shares constituted willful ignorance on her part of any possible adverse claim evidencing bad faith.

■ In reviewing these circumstances, we conclude as a matter of law that if Carr was not actually aware of Marietta's adverse claim, it was only because she was

willfully ignorant of this fact. In reaching this conclusion, we find several facts highly probative of Carr's mental state. First, Carr admitted that she read the restrictive legend appearing on the face of the share certificate and was aware that it constituted a restriction on the transferability of the shares. Second, Carr obtained the shares with full knowledge that the transfer agent [8] had refused to repurchase the shares from Sequoia on a prior occasion and that Marietta refused to repurchase the shares as well. Third, as someone involved in the banking industry, Carr was a sophisticated investor who was well aware of the laws and regulations governing securities. *See Catizone v. Memry Corp.*, 897 F.Supp. 732, 738 (S.D.N.Y.1995) (party's knowledge and experience with securities make it unlikely that party acted in good faith in the face of suspicious circumstances); *Otten*, 235 F.Supp. at 798 (party who was "sophisticated in business transactions" had duty to inquire once aware of suspicious circumstances). Fourth, Carr knew that Sequoia believed that Marietta refused to purchase the Walsh Shares because they had previously been pledged. Fifth, Carr was aware that Walsh signed a promissory note to Marietta on February 9, 1996 (the 1996 Note) for $121,500 and that her brother had other outstanding debts. *Cf. Garner v. First Nat. City Bank*, 465 F.Supp. 372, 383 n. 15 (S.D.N.Y.1979) (knowledge of transferor's troubled financial status relevant in determining whether transferee acted in good faith).[9] Sixth, Carr purchased both the Walsh Shares and Sequoia's judgments against Walsh in the amount of $132,633.62 for a purchase price of $27,500. *Cf. Sec-*

*ond Nat. Bank of Morgantown v. Weston*, 172 N.Y. 250, 257, 64 N.E. 949, 951 (1902) (party's purchase of note at large discount supports inference that party acted in bad faith). Seventh, Carr maintains that she never spoke with her brother regarding any encumbrance on the shares, despite her admission that she speaks with him as a family member on a regular basis. *Cf. Scarsdale Nat. Bank*, 533 F.Supp. at 387 (concluding that transferee did not act in good faith supported by fact that transferee was "good friend" with transferor).

Given these facts, the only way that Carr could not have known that Walsh had failed to pay Marietta for the Walsh Shares, or that there was an adverse claim, was if she engaged in a purposeful effort to avoid knowing these facts. As a result, Carr did not act in "good faith" under the meaning of Section 628(b). The district court was correct to grant defendant's motion for summary judgment and dismiss the complaint since plaintiff is subject to the same offset as was her brother Thomas Walsh and accordingly can take nothing from this action.

■ Finally, we also reject Carr's argument that she is entitled to the "good faith" protections of the "shelter rule" found in the UCC. As we understand Carr's position, she argues both that the "shelter rule" found in the UCC trumps whatever liability Section 628 imposes and that Section 628 should be read to provide protection to those who obtain stock from pledgees of shares. We express some doubt as to whether Carr is correct in her interpretation of the "shelter rule" [10] found

8. The transfer agent, Continental Stock Transfer & Trust Company, was an entity retained by Marietta to oversee the repurchase of Marietta stock pursuant to the Plan of Merger.

9. Carr admitted during a deposition that she had the Stock Purchase Agreement and the 1996 Note prior to purchasing the Walsh Shares from Sequoia. The Stock Purchase Agreement specifically states that the purchase of the shares was financed by a promissory note for $121,500 (the 1989 Note), and

the 1996 Note for the identical amount also refers to the Stock Purchase Agreement. Given these facts and the knowledge that Marietta had previously refused to repurchase the shares, no objectively reasonable person would fail to inquire as to whether the 1996 Note was connected with the purchase of the Walsh Shares and whether this note had been paid.

10. UCC § 8–302 Rights of Purchaser

in the UCC, given authority to the contrary. *See* William M. Fletcher, 12 *Fletcher Cyclopedia of the Law of Private Corporations,* § 5478 (1996) ("Whether a transferee takes from a bona fide purchaser or from a protected purchaser, the transferee who was involved in fraud or had notice of an adverse claim does not thereby improve its position.") (citing UCC § 8–302(c)(1994)). We need not address this question of UCC interpretation, however, since regardless of what the UCC provides, there is no indication of an analogous "shelter rule" in N.Y. Bus. Corp. Law § 628.[11] Thus, it would be improper to read the general provisions of the shelter rule as supplanting the specific provisions of Section 628, which pertain directly to the circumstances in this case. *Cf. Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 445, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987) (" '[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.' ") (quoting *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976)); *St. Germain v. St. Germain,* 25 A.D.2d 568, 569, 267 N.Y.S.2d 789, 791 (2d Dep't 1966) ("When a particular statute conflicts with a general one, the particular statute will be deemed an exception where it is incompatible with the provisions of the general statute.") (citing McKinney's Consol. Laws of NY, Book 1, Statutes, § 238).

## III. CONCLUSION

For the above reasons, the decision of the district court is affirmed.

---

(1) A "bona fide purchaser" is a purchaser for value in good faith and without notice of any adverse claim
(a) who takes delivery of a certificated security in bearer form or of one in registered form issued to him or indorsed to him or in blank; or
(b) to whom the transfer, pledge or release of an uncertificated security is registered on the books of the issuer; or
(c) to whom a security is transferred under the provisions of subparagraph (c), (d)(i) or (g) of subsection (1) of Section 8–313.
(2) "Adverse claim" includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security.
(3) A bona fide purchaser in addition to acquiring the rights of a purchaser (Section 8–301) also acquires his interest in the security free of any adverse claim.
(4) Notwithstanding subsection (1) of Section 8–301, the transferee of a particular certificated security who has himself been a party to any fraud or illegality affecting the security or who as a prior holder of that certificated security had notice of an adverse claim cannot improve his position by taking from a later bona fide purchaser.
N.Y. UCC § 8–302, *repealed by* L.1997, c. 566, § 5. *See* N.Y. UCC § 8–302 Historical and Statutory Notes (McKinney 1990 & Supp. 1999).

**11.** We agree with Carr's contention that Section 628 must be read to provide greater protection for commercial pledge transactions, *see* N.Y. Bus. Corp. Law § 628(c) (providing protection for those holding security as collateral), and we believe nothing in this decision calls that protection into question. We disagree with Carr, however, in her assertion that she is somehow entitled to the same commercial "good-faith" exemption that a bank enjoys in a similar situation. We find no authority, nor do we see any principled reason, why Carr should be afforded the same protections as a commercial entity since Carr is neither a commercial entity or a pledgee, but rather a private transferee. *Cf. Brown v. Rosetti,* 66 Misc.2d 239, 239–40, 319 N.Y.S.2d 1001, 1002 (1971) (stating that because banks regularly engage in securities transactions, it is more likely that they act in good faith in taking securities since it is their "usual course of business") (citing *Canajoharie Nat. Bank v. Diefendorf,* 25 N.E. 402, 404, 123 N.Y. 191, 201 (1890)). Thus, we need not consider the effect of a commercial "good faith" exception in this case.